By the Court—Barbour, J.
The case shows that prior to the 27th of February, the Broadway Bank had' loaned to Champlin, the plaintiffs’ assignor, moneys at several times, for which the bank then held Ohamplin’s stock notes, payable on demand, and secured by sundry shares of stock named in the notes, as well as another note of Champlin for $2,750- payable on demand, secured, collaterally, by a three months’ note for $3,000, signed by Boberton & Dustan; and the bank had also discounted for Champlin, and then held his promissory note for $3,000 payable three months’ from date and not then due, which *534 last mentioned note and the said stocks were then in possession of the bank. Ohamplin had also, a few days previously, deposited with the bank his draft for $3,000, payable ten days after sight, drawn by him upon 0. E. D. Wood, of Paducah, Kentucky, to be sent by the bank to Paducah for acceptance.
On the day above mentioned, Ohamplin called at the bank and then had a conversation with its president, who, upon his examination as a witness in this action, stated the details of the interview and conversation, as follows:
“ On the 27th of February, 1857, he ” (Ohamplin) “ called. “ at the bank and wanted to know if we had heard from “ the draft. I told him no, we had not. He then said he “ must have the proceeds of the draft that day, or he must “goto protest for the first time. I told him the bank could “ not doit, unless the hank had collateral seeurity, as it was “ one name paper. Ohamplin then said: The hank holds “ all my stocks, and they are security for all my discounts and “ this drafV I said if that was so, the bank would put “ the’proceeds of this draft to his credit; and we did so.”
I am unable to resist the conclusion that this declaration of Ohamplin, followed as it was, by the discounting of his draft by the officer of the bank, to whom it was addressed, was a pledge, in prcesenti, of the stocks then held by the bank, for the purposes expressed in such declaration; that is, as security for all the discounts which had been made-for Ohamplin as well as for that draft.
Let us look at the circumstances surrounding the transaction : Ohamplin, upon the brink of ruin, as he supposed, and with the greatest calamity pending over him that can -fall upon the head of an honorable merchant, the public protest of his paper for non-payment, and the consequent .destruction of Ms reputation and credit, was precisely in the condition best calculated, if not most certain, to induce Mm to make that or any other pledge of his stocks, necessary to avert the impending evil. Oan it be doubted, then, that when he was informed by the president that his draft, .could not be- discounted, for the reason that it was only *535 one name paper, or, in other words, that it was not .sufficiently secured, he designed, by his answer, to jBedge all Ms stocks, believing, as he told the president he did, that nothing but such discount would save him from protest ? If there is any ambiguity in the words used, it is proper to consider this as a means of ascertaining the probable intention of the parties. But, considering that the bank was already in possession of the stocks as security for some indebtedness of Champlin’s, I see no ambiguity in the language.
Very little is necessary to constitute a pledge. It is only essential that the property be, or be placed by the owner, in the hands of the creditor or trustee, with an intention, on the part of both parties, that it shall be retained as security for a certain debt or claim. In this case, the stocks were already held by the bank. Suppose they had not been, but that, when Champlin said, “ the bank holds all my stocks, and they are security for all my discounts and tMs draft,” he had, at the same ' time, handed the stocks to the president, would that have made the case any stronger ? And can any one doubt, that, in the case opposed, the intention of Champlin to pledge the stocks, at that time, and in that manner would have been plain and manifest ?
The declaration of Champlin was, at any rate, an admission that the stocks were then held by the bank as security for his discounts, an admission which Ms assignee is now estopped to deny. But it was not an admission that they were held as security, also, for the draft, for, at that time, the draft had not been discounted. And yet, Champlin told the president that all the stocks were held by the bank as security for all the discounts, and also for the draft; showing, conclusively, that he designed not merely to admit that they were already held as security, but to repledge them for the draft, as well as for the preexisting debt; and to this the president assented, and thereupon, and clearly in consequence of such repledging, discounted the paper.
*536 Again, the declaration touching the discounts which had been made, and the draft, of which Ohamplin was still the owner, was in one sentence, covering both as much as either; how, then, can it be said that the stocks were pledged for the draft, at that time, and not for the discounts ?
Regretting, as I do, to be compelled to differ from the conclusion to which the very able lawyer, before whom, as Referee, the cause was tried, has arrived, to the effect that the bank is not entitled to retain the stock as security for all discounts, which, at the time of this conversation, had been made to Ohamplin by the bank, my mind is forced to the conclusion that the judgment entered upon the report of the Referee should be reversed, and a new trial awarded.
Robertson, J., wrote a dissenting opinion, he holding that upon a view of all the evidence bearing upon the transaction in question, the additional pledge was only as security for the draft, and not for previous discounts.
Judgment reversed and new trial ordered.