## COURT OF APPEALS,

March 16, 1909.

# THE PEOPLE EX REL. JOHN R. HAGEMAN v. JOSEPH E. CORRIGAN ET AL.

(195 N. Y. 1.)

(1). PERJURY—EVIDENCE—FALSITY OF TESTIMONY MUST BE MATERIAL.

To constitute perjury, the testimony, the falsity of which is charged, must be material, and on a prosecution therefor it is a question of law for the court whether or not it is material.

(2). SAME—CRIMINAL INTENT.

To constitute perjury, there must be criminal intent. Ordinarily, criminal intent is an intent to do, knowingly and willfully, that which is condemned as wrong by the law and common morality of the country, and if such an intent exists, it is neither justification nor excuse that the actor intended by its commission to accomplish some ultimate good.

(3). SAME—AFFIANT MUST KNOW TESTIMONY IS FALSE.

To constitute perjury, it is not necessary to establish any other intent than that specified in the statute. It is not sufficient that the affiant testifies as to what is false, but the testimony must be given willfully and knowingly, and the affiant must know that the testimony is false; if it be given in the honest belief that it is true, or by mistake or inadvertence, the case does not fall within the statute.

(4). SAME.

Relator, president of an insurance company, verified a report to the insurance department of the State, pursuant to the statute, in the form prescribed by the superintendent of insurance, which form required a statement of the loans of the company secured by pledged stock or other collateral on the 31st day of December, 1904. In answer to this inquiry he stated there were none. On the 30th day of December, 1904, as alleged in the information upon oath charging relator with the crimes of perjury and forgery, the insurance company had outstanding loans to a very large amount to the knowledge of relator. On that date the relator sent to a firm of brokers a package containing notes and collaterals for such loans, accompanied by a letter requesting a check for the amount secured thereby, which letter stated: " We will reverse this transaction according to understanding on Tuesday, Jan-

ary 3rd, 1905." The brokers sent the check, which was deposited to the credit of the insurance company. On January 3, 1905, the relator inclosed a check for the same amount to the brokers and requested the return of the securities, which was done. The brokers were also paid interest for the time they held the loans, which was entered on the books of the insurance company as " interest, temporary loan." *Held*, that the statement made by relator was material; that the transaction with the brokers did not constitute a transfer in law of the title of the loans to the brokers, but that the insurance company still remained the owner. At least a jury might find from the evidence that the transaction was merely a device to enable the relator to make the return which he intended to make to the department, and the evidence contained in the affidavits presented to the magistrate was sufficient to present the following questions of fact: *First*. Were the facts stated by the relator in the report true or false? *Second*. If false, did the relator know them to be false when he verified the report?

(5). SAME.

An information charged that relator with intent to defraud caused false entries to be made in the cash book of the insurance company of which he was president, and that such entries were false in that they purported to set forth that the company had made temporary loans to the persons mentioned and in the amounts indicated by the entries, whereas in fact no such loans had been made on that day as the relator well knew. *Held*, that the evidence contained in the depositions accompanying the information did not tend to show the commission of an offense under section 515 of the Penal Code. The entries in no way operated to defraud the company or any one else, nor had there been any larceny or misappropriation which an entry could serve to conceal or cover up.

People v. Wiman, 148 N. Y. 29, distinguished,
People ex rel. Hegeman v. Corrigan, 129 App. Div. 62, reversed.
People ex rel. Hegeman v. Corrigan, 129 App. Div. 75, affirmed.

APPEAL from an order of the Appellate Division of the Supreme Court in the First Judicial Department, entered December 11, 1908, which reversed an order of Special Term dismissing writs of habeas corpus and certiorari to inquire into the legality of the detention of the relator on a charge of perjury, and directed his discharge from custody. Also, appeal from an order of the Appellate Division of the Supreme Court in the First Judicial Department, entered December 11, 1908,

which affirmed an order of Special Term sustaining writs of habeas corpus and certiorari to inquire into the legality of the detention of the relator on a charge of forgery and directing his discharge from custody.

The charges of perjury and forgery are based on the same transactions, and although the proceedings were separate, the two cases will be considered together in this opinion.

On February 19th, 1908, a police officer laid before the defendant, Corrigan, one of the city magistrates, an information upon oath charging the relator, upon information and belief, with the crimes of perjury and forgery, in that, being the president of the Metropolitan Life Insurance Company, he, on the 26th of January, 1905, verified before a notary public a false report made to the superintendent of insurance, purporting to be an annual statement of the company's financial condition on December 31st, 1904, in which he had stated, in substance, that the company had no loans secured by pledge of stocks and bonds or other collateral; whereas, in truth and in fact, as the relator then well knew, there was owing to the company the sum of $1,492,875 because of such loans. Also, on the 3d day of January, 1905, the relator, as such president of the Metropolitan Life Insurance Company, with intent to defraud, did feloniously make and cause to be made a certain false entry in the cash book belonging to the company, and kept under his direction as president, certain entries of loans to individuals and corporations specifically mentioned aggregating the amount aforesaid, which entries were false in that they purported to set forth and signify that the company had on that day made temporary loans to the persons mentioned and in the amounts indicated by the entries, whereas, in fact no such loans had been made on that day, as the relator well knew. The information so presented to the magistrate was accompanied with depositions of a large number of persons, and the annual report made to the superintendent of insurance as to

the financial condition of the company on the 31st day of December, 1904, together with copies of entries in books and of checks drawn and received by the company. Upon the information and depositions so presented to the magistrate he issued two warrants, one charging the relator with the crime of perjury and the other charging him with the crime of forgery, upon which he was arrested by the peace officer. Thereupon habeas corpus was sued out in his behalf and a writ of certiorari obtained in each case, bringing up for review the action of the magistrate upon the information and depositions so presented to him.

The substantial facts disclosed by the depositions are to the effect that the officers of the Metropolitan Life Insurance Company had for the last fifteen years made loans secured by collateral in various amounts to different individuals, and that at the end of each year the loans so made and secured were turned over to the banking company of Vermilye & Co., who issued a check for the amount of such loans and delivered the same to the insurance company, which check was deposited to its credit, and that thereupon and on the second or third day of the new year the proceeding was reversed by the delivery by Vermilye & Co. of the notes representing the loans and the securities accompanying the same to the insurance company, which in turn would draw its check for the amount thereof and deliver the same to Vermilye & Co. On the 30th day of December, 1904, it appears that the insurance company had outstanding loans of the character described to the amount of $1,492,875, and on that date the relator sent to Vermilye & Co. a package containing notes and collaterals for such loans with a letter referring to other matters, but closing with the statement: "For the accompanying package please send us your check for $1,492,875. We will reverse this transaction according to understanding on Tuesday, January 3, 1905. Very truly yours, John R. Hegeman, President." This package

was received by Vermilye & Co. and their check for that amount was returned and deposited to the credit of the insurance company.

On the third day of January the relator inclosed a check of the insurance company to Vermilye & Co., with the following letter: "Gentlemen: Find herewith this company's check to your order for $1,492,875, for which return by bearer the securities delivered to you on the 31st ultimo." This was done and on that date there was entered in the cash book a list of these loans showing the cash that had been paid out therefor. Thereafter the relator signed and verified the correctness of the report made by him as such president to the insurance department of the State in which the statement is made, to which we have already referred, to the effect that the insurance company had on the 31st day of December no loans outstanding secured by collateral.

There was also submitted to the magistrate at the time of the application for the warrant the affidavit of William A. Read, who was then a member of the firm of Vermilye & Co. and who had principal charge of the transactions in question. After setting forth in detail the letters that passed between the parties, he said: "I do not know that any examination was made of the sufficiency of these securities when they were transferred to Vermilye & Co. at the end of the year. I do not think that I ever directed any such examination to be made. I simply turned the matter over to the head of the bond department, or one of the partners, and said, ' Mr. Hegeman has one of these year-end transactions. Fix it up and let him have the money.' As a matter of fact, Vermilye & Co. did not care at all what securities the Metropolitan Life transferred to them. If on December 31st Mr. Hegeman had handed me an envelope with a lot of brown paper in it and had asked me for a million dollars on it until the beginning of the next year I should have given it to him if he had given me the

note of the company with a lot of brown paper as collateral. In transferring these loans to Vermilye & Co. the Metropolitan Life usually accompanied the notes of the borrower by a letter which in substance represented to Vermilye & Co. that after the end of the year the Metropolitan Life would take back the same loans at the same price. Vermilye & Co. were not at that time in the market to purchase notes generally. What they did in the way of purchasing the Metropolitan collateral loans was done to oblige a very valued client, *and they would probably not have bought the loans from the Metropolitan if they had not an understanding with Mr. Hegeman that after the end of the year the Metropolitan would purchase them back.* During the time that Vermilye & Co. had the loans in their possession they would not have been acting in an honorable way and in good faith if they had sold them to a third party, *because Vermilye & Co. had already resold them to the Metropolitan Life for delivery early in January.* The sale to Vermilye & Co. and resale to Metropolitan Life were simultaneous. That was the understanding, although there was no expression of it beyond the letters from the Metropolitan Life to us."

It further appeared by the deposition of the assistant cashier of the company that on the day after the return of the notes and collateral to the insurance company by Vermilye & Co., the company, by a separate check, paid to Vermilye & Co. the sum of $497.63, which was entered in the cash book: "Interest, temporary loan, V. & Co. $497.63"—evidently being interest on the amount advanced by Vermilye & Co. for the three days during which they held the loans.

*William Travers Jerome, District Attorney (Robert C. Taylor* and *Isidore J. Kresel,* of counsel), for appellant. The depositions abundantly sustain the action of the magistrate. *People ex rel. Perkins v. Moss,* 187 N. Y. 410. As respects the materiality of the alleged perjury, any argument that the matters sworn to in the report were not material is unsound.

*People v. Davis,* 122 App. Div. 569, 191 N. Y. 514. The year-end transactions were not actual sales, but were mere bailments or pledges. *Bright v. Wagle,* 33 Ky. 252; *Matter of Galt,* 120 Fed. Rep. 64; *Foster v. Pettibone,* 7 N. Y. 433; *Sattler v. Hallock,* 160 N. Y. 291; *Kimball v. Hildreth,* 90 Mass. 167; *Newton v. Fay,* 92 Mass. 505; *Walker v. Staples,* 87 Mass. 34; *Campbell v. Parker,* 22 N. Y. Super. Ct. 322; *Westcott v. Tilton,* 8 N. Y. Super. Ct. 53; *Downer v. Rowell,* 22 Vt. 347. The depositions before the magistrate on the forgery have amply justified the inference of an intent to defraud. *People v. Conroy,* 97 N. Y. 62; *Burdick v. Post,* 12 Barb. 168; *Phelps v. People,* 72 N. Y. 334; *People v. Herzog,* 47 Misc. Rep. 50; *U. S. v. Taintor,* 11 Blatchf. 374; *U. S. v. Curley,* 122 Fed. Rep. 738; *Curley v. U. S.,* 195 U. S. 628; *U. S. v. Stone,* 135 Fed. Rep. 392; *Gantt v. U. S.,* 108 Fed. Rep. 61; *McGregor v. U. S.,* 134 Fed. Rep. 187; *Bradford v. U. S.,* 148 Fed. Rep. 413, 152 Fed. Rep. 617, 206 U. S. 563.

*Morgan J. O'Brien, John G. Milburn, De Lancy Nicoll, R. V. Lindabury* and *John D. Lindsay,* for respondent. Since it was the intention of the parties to the year-end transaction of 1904-5 that there should be an actual sale of the collateral loans, and that the title thereto should pass to Vermilye & Co., and since this intention was followed by the actual delivery of the notes and collateral and the actual payment of the amount, it is perfectly clear that the transaction did amount to a sale and was effective to transfer the legal title. *Heryford v. Davis,* 102 U. S. 235; *People v. Ryan,* 88 N. Y. 142; *People v. McComber,* 7 N. Y. Supp. 71; *Wheeler v. Allen,* 49 Barb. 460, 51 N. Y. 37. The truth or falsity of the relator's oath depending concededly upon the legal effect of the year-end transaction, perjury cannot be assigned thereon. *Lambert v. People,* 76 N. Y. 220; *State v. Wolverton,* 8 Blackf. 452; *State v. Henderson,* 90 Ind. 406; *Dempsey v. People,* 20 Hun, 261. Even though this court should hold that the relator was mistaken as

to the legal effect of the transaction, there was an utter absence of proof before the magistrate that the relator did not believe that he had effected the result he intended to accomplish. *People ex rel. Perkins v. Moss,* 187 N. Y. 426; *Comm. v. Brady,* 5 Gray, 78; *People v. Doody,* 72 App. Div. 372, 172 N. Y. 165; *Lambert v. People,* 76 N. Y. 220; *Johnson v. People,* 94 Ill. 505. There was an utter absence of proof before the magistrate that the relator was inspired by any criminal or corrupt motive. *People ex rel. Perkins v. Moss,* 187 N. Y. 426; *People v. Dishler,* 38 Hun, 175; *Steinman v. McWilliams,* 6 Penn. St. 170; *Hoorman v. C. C. Co.,* 9 App. Div. 579; *State v. Dodd,* 7 N. C. 226; *People v. Gillette,* 126 App. Div. 665; *Matter of Howell,* 114 Cal. 250; *People ex rel. Tweed v. Liscomb,* 60 N. Y. 559. The evidence before the magistrate shows conclusively that the entries were made without any criminal intent or intent to defraud on the part of any one. Penal Code, § 515, subd. 2; *People v. Fitch,* 1 Wend. 198; *State v. Boasso,* 38 La. Ann. 202; *Jackson v. Weisiger,* 41 Ky. 214; *Regina v. Tylney,* 1 Den. Cr. Cas. 319; *Regina v. Hodgson,* 7 Cox Cr. Cas. 122; *Phelps v. People,* 72 N. Y. 370; *State v. Cross,* 101 N. C. 770; *Cross v. North Carolina,* 132 U. S. 131; *U. S. v. Taintor,* 11 Blatchf. 374; *Starcy v. C. G. Co.,* L. R. (24 Q. B. D.) 90.

CULLEN, Ch. J.:

The perjury with which the relator is charged is the verification under oath of a report to the insurance department of the State, in which, in answer to a question calling for a statement of the loans held by the company secured by the pledge of bonds, stock or other collateral, it was stated that there were none. For the purpose of determining whether the evidence was sufficient to justify the magistrate in issuing a warrant, it becomes necessary to consider the rules of law applicable to the case. Section 96 of the Penal Code prescribes: " A per-

son who swears or affirms that he will truly testify, declare, depose, or certify, or that any testimony, declaration, deposition, certificate, affidavit or other writing by him subscribed, is true, in an action, or a special proceeding, or upon any hearing, or inquiry, or on any occasion in which an oath is required by law, or is necessary for the prosecution or defense of a private right, or for the ends of public justice, or may lawfully be administered, and who in such action or proceeding, or on such hearing, inquiry or other occasion, wilfully and knowingly testifies, declares, deposes, or certifies falsely, in any material matter, or states in his testimony, declaration, deposition, affidavit or certificate, any material matter to be true which he knows to be false, is guilty of perjury."

Therefore, to constitute perjury the false statement must be material. Section 44 of the Insurance Law (L. 1892, ch. 690) requires every corporation of the character of the Metropolitan Life Insurance Company annually on the 1st day of January or within two months thereafter, to " file in the office of the Superintendent of Insurance a statement verified by the oath of at least two of the principal officers of such corporation, showing its condition on the 31st day of December then next preceding, which shall be in such form and shall contain such matters as the Superintendent of Insurance shall prescribe." In pursuance of the authority thus conferred by the statute, the superintendent of insurance required the company to report a statement of loans secured by pledged stock or other collateral, and furnished an appropriate blank for the purpose. The answer to this inquiry was none. The report made in compliance with this requirement was verified by the relator to the effect that the " foregoing statement, with the schedules and explanations herein contained, annexed or referred to are a full and correct exhibit of all the assets, liabilities, income and disbursements and of the condition and affairs of the said company on the said 31st day of December last and for the year ending on

that day, as the same were in fact and as the same are shown by the books of the company, and that the foregoing declarations and answers are made according to the best of their information, knowledge and belief respectively."

1. The question whether in a prosecution for perjury the testimony, the falsity of which is charged, is material or not is a question of law for the court. Bishop's Crim. Law, sec. 1039a; *Power v. Price,* 16 Wend. 450. That the statement made by the relator was material seems to me not open to doubt. Corporations are creatures of the State which incorporates them, and subject to its regulation and control except when legislation invades property rights. The legislature of the State declared that every corporation of the character of that before us should annually make a report to the superintendent of insurance of its condition on the 31st day of December preceding, and that the report should be in such form and contain such matters as the superintendent should prescribe. It was, therefore, for the superintendent to determine what details of the condition of the company he required, and so far as his requirements related to the subject-matter committed to his discretion, to wit, the condition of the company, such requirement necessarily made the answer to the inquiry material. It cannot be tolerated that an officer of a corporation shall set up his judgment against the law to assert that a statement which the law requires him to make is not material. It is quite clear that information as to the character of the investments made by the company and the amount of such investments respectively might be of great importance to enable the superintendent of insurance to intelligently pass upon the condition of the company. The fact that in this case all the loans were well secured is immaterial. In other cases, the loans might be unsafe  However that may be, it is sufficient to say that the superintendent was entitled to true information, and that the legislature and insurance department, having declared such in-

formation material, that declaration was conclusive on all offi-
cers under legislative control.

2. I am of opinion that the so-called "year-end" transac-
tions, the details of which appear in the statement of facts, did
not constitute in law a sale of the loans to Vermilye & Co. I
differ froin the learned judge who wrote for the majority of
the Appellate Division in the opinion that Vermilye & Co.
were not under any obligation to return the loan to the insur-
ance company after the 1st of January. The letter written
by the relator on December 30th, which accompanied the secu-
rities transferred to Vermilye & Co., informed them that "For
the accompanying package please send us your check for
$1,492,875. We will reverse this transaction according to un-
derstanding on Tuesday, January 3rd, 1905. Very truly
yours, John R. Hegeman, President." Vermilye & Co., hav-
ing received the loan, necessarily assented to the terms pre-
scribed by the relator in his letter, by which it was agreed that
the transaction should be reversed on the 3rd of January, *i. e.*,
that Vermilye & Co. should return the loans to the insurance
company and that the latter should repay the moneys they had
received from Vermilye. This was an obligation binding on
both parties. The payment on January 4th to Vermilye & Co.
of interest on the money advanced by them is also of the utmost
importance in characterizing this transaction. I think that all
this did not constitute in law a transfer of the title of the loans
to Vermilye & Co., but that the insurance company was still
the owner. At least, the jury might find from the evidence
that it was not a real transaction, but a colorable one only, being
merely a device to enable the relator to make the return which
he intended to make to the department. The question here is
the same as that often presented in transactions assailed for
usury, referring to which the court, through Judge ALLEN,
said (*Quackenbos v. Sayer,* 62 N. Y. 344): "The transac-
tion must be judged by its real character, rather than by the

form and color which the parties have seen fit to give it. The shifts and devices of usurers to evade the statutes against usury, have taken every shape and form that the wit of man could devise, but none have been allowed to prevail." I think shifts and devices to avoid a true report where the same is required by law must meet similar condemnation. The case of *People ex rel. Thurman v. Ryan,* 88 N. Y. 142, is not in point. There unquestionably the relator was the owner of the bonds and the bank was his creditor. There was no agreement as to the subsequent disposition of them or to cancel and rescind the purchase, nor did such a course seem to have been even contemplated.

3. Doubtless, to constitute perjury there must be criminal intent, but intent must be distinguished from motive and from ultimate object. As was said by Judge WERNER in *People v. Molineux,* 168 N. Y. 264, 297, 16 N. Y. Crim. Rep. 120: " In the popular mind intent and motive are not infrequently regarded as one and the same thing. In law there is a clear distinction between them. Motive is the moving power which impels to action for a definite result. Intent is the purpose to use a particular means to effect such result." See, also, Burrill's Law Dictionary, Vol. 1. " Motive is that which incites or stimulates a person to do an act. * * * Motive is never an essential element of a crime. A good motive does not prevent an act from being a crime." Clark's Crim. Law, sec. 14. There runs through the criminal law a distinction between offenses that are *mala prohibita* in which no intent to do wrong is necessary to constitute the offense, and offenses that are *mala in se* in which a criminal intent is a necessary ingredient of the crime. While there are to be found both in judicial decisions and in text books elaborate discussions of what is a criminal intent, no attempt has been made to accurately define the term. Very possibly the attempt to make a definition so comprehensive as to be applicable to all cases would be futile,

and it has often been doubted whether the term " intent " is an accurate one. However this may be, it is very apparent that the innocence or criminality of the intent in a particular act generally depends on the knowledge or belief of the actor at the time. An honest and reasonable belief in the existence of circumstances which, if true, would make the act for which the defendant is prosecuted innocent, would be a good defense. Thus, if a man killed another under such circumstances as gave proper and reasonable grounds for the belief that the person killed was about to take the life of the slayer, although the person killed was only playing a practical joke, no crime would be committed. But if the facts and circumstances which the person believed to exist were not such as in law to justify his act, then there would be no defense to the act. In other words, it is the knowledge or belief of the actor at the time that stamps identically the same intent as either criminal or innocent, for the intent to take life, unless under circumstances that the law regards as sufficient to justify the taking, is the criminal intent and the only criminal intent that can exist in case of murder (excepting where the killing is done in the commission of an independent felony). So, ordinarily, a criminal intent is an intent to do knowingly and wilfully that which is condemned as wrong by the law and common morality of the country, and if such an intent exists, it is neither justification nor excuse that the actor intended by its commission to accomplish some ultimate good. 1 Bishop's Crim. Law, § 341.

To constitute perjury under our law it is not necessary to establish any other intent than that specified in the statute, for by its terms it is not sufficient that the affiant testifies as to what is false, but the testimony must be given willfully and knowingly, and the affiant must know that the testimony is false; if it be given in the honest belief that it is true, or by mistake or inadvertence, the case does not fall within the statute. Therefore, if a person willfully testifies to what he

knows to be false, this is the criminal intent and the only criminal intent that can exist in the crime. That the ultimate object to be attained by the perjury may be beneficient or indifferent in no way absolves or qualifies the criminality of the act. One may not commit a crime because he hopes or expects that good will come of it. It is no defense to a charge of intentionally committing an act prohibited by law even that the dictates of his religious belief require one to do the act. In *Reynolds v. United States,* 98 U. S. 145, the prisoner was indicted for having committed bigamy in Utah, and contended in his defense that polygamy was a duty enjoined on him by his religious belief. The court there said: "This (defense) would be introducing a new element into criminal law. Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices. Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice?" In *People v. Pierson,* 176 N. Y. 201, this court upheld a conviction for misdemeanor where the father, acting under the dictates of his religious faith, failed to call a physician to attend his sick child. To the same effect, see *Regina v. Morby,* L. R. (8 Q. B. D.), 571, and *Regina v. Downes,* 13 Cox Crim. Cas. 111. In that case the defendant, far from intending to injure his child, sought by his conduct to preserve it, and believed that his action would most conduce to that result.

There is nothing inconsistent with these views in *People v. Wiman,* 148 N. Y. 29. There this court affirmed an order reversing a conviction for forgery in the second degree on the ground that the trial court should have charged a request that to constitute the crime the acts must have been committed with a criminal intent. The court had charged the jury that there must be an intent to defraud. A casual reading of the opinion

might lead to an erroneous conception of the point decided. A careful examination, however, shows that the real difficulty in the case was the restricted meaning which the trial court gave to the term " defraud," and its refusal to charge that if the defendant believed that under the rules of law he had legal authority to make the check and indorse it as he did, the crime was not forgery. This appears from the conclusion of the opinion, where it is said: " The charge as made, taken in connection with the remarks of the court and its refusal to charge as requested, was confusing, and rendered uncertain the question as to whether ' criminal intent ' was or was not essential in order to constitute the crime." Indeed, if the court after charging that a criminal intent was necessary to a conviction, had been asked by the jury to instruct them as to what would constitute a criminal intent, it is difficult to suggest any other answer the court could have given than that it was an intent to defraud.

If one may not violate the law with impunity in obedience to the requirements of his religious faith, much less can he justify such violation merely to escape personal inconvenience or annoyance. Therefore, the explanation offered by the relator that his act was impelled solely by the desire to escape the importunities of " Wall street," if true (and the truth of this statement was plainly a question of fact), is entirely immaterial to the charge against him. The sole questions in this prosecution are: 1st. Were the facts stated by the relator in the report true or false. 2nd. If false, did the relator know them to be false when he verified the report. Though the statements made in the return may have been incorrect, if the relator made them in good faith either by inadvertence or mistake, or in the honest belief that the statements were true, then, of course, he did not commit the offense. We think the evidence contained in the affidavits was sufficient to present a question of fact on these issues.

The order of the Appellate Division should be reversed, that of the Special Term affirmed, and the relator remanded to custody.

The forgery charge is based on section 515 of the Penal Code, which provides: "A person, who, with intent to defraud or to conceal any larceny or misappropriation by any person of any money or property, either,

"1. Alters, erases, obliterates, or destroys an account, book of accounts, record, or writing, belonging to, or appertaining to the business of, a corporation, association, public office or officer, partnership, or individual; or,

"2. Makes a false entry in any such account or book of accounts; or,

"3. Willfully omits to make true entry of any material particular in any such account or book of accounts, made, written, or kept by him or under his direction;

"Is guilty of forgery in the third degree."

The evidence contained in the depositions did not tend to show the commission of an offense under this section. To constitute that offense the false entries or alterations must be made "with intent to defraud or to conceal any larceny or misappropriation by any person of any money or property." The entries of which complaint is made at most simply purport to show that the loans were made on the date of such entries. It may be that these entries tended to deceive any one examining the company's books, but they could in no way operate to defraud the company or any one else. Nor had there been any larceny or misappropriation which the entries could serve to conceal or cover up.

The order of the Appellate Division discharging the relator on this charge should be affirmed.

HAIGHT, J.:

I concur only in the result reached by the chief judge.

I am of the opinion that the facts disclosed by the depositions

presented to the magistrate, with the inferences which may be legitimately drawn therefrom, were sufficient to justify him in issuing a warrant for the arrest of the relator charging him with the crime of perjury.

VANN, WERNER, WILLARD BARTLETT, HISCOCK and CHASE, JJ., concur with CULLEN, Ch. J.; HAIGHT, J., concurs in result in memorandum.

Ordered accordingly.