## SUPREME COURT — APPELLATE DIVISION — SECOND DEPARTMENT.

April 9, 1920.

## THE PEOPLE v. MORTON ATWATER.

(191 App. Div. 345.)

(1) PENAL LAW, SECTION 956, SUBDIVISION 1—HYPOTHECATION OF CUS-TOMERS' SECURITIES BY BROKER—EVIDENCE NOT JUSTIFYING CONVICTION—CHARGE.

On appeal from a judgment convicting the defendant of the crime of "hypothecation of customers' securities," in violation of subdivision 1 of section 956 of the Penal Law, it appeared that the defendant was a member of a firm of stockbrokers which took subscriptions from customers for the various Liberty loans made to the government, receiving on such subscriptions the initial payment of two per centum. Instead of turning over the subscriptions to banks the firm subscribed for Liberty bonds in its own name at various banks to cover the bonds subscribed for by the customers, paying two per cent to the banks and giving a three months' collateral note to cover the balance of the subscriptions, it being further agreed that the bonds, when issued, were to be received by the bank and held as collateral security for the payment of the firm's note. On the day following the giving of the note certain of the firm's customers paid the balance of their subscription to the defendant's firm, which retained the moneys, and when the note fell due the defendant, representing the firm, renewed the same and paid the discount.    It

appeared further that the bank dealt only with defendant's firm in the transaction and that the bonds were never in the physical possession of the firm but were retained by the bank as collateral. The firm of which the defendant was a member was subsequently ruined financially by defalcation of certain partners made wholly without the defendant's knowledge and which resulted in his own financial ruin.

*Held,* that the defendant was not guilty of a violation of said section 956 of the Penal Law and that a judgment of conviction should be reversed and the indictment dismissed.

(2) Same—Intent.

The intent necessary to sustain a conviction for a violation of section 956 of the Penal Law for the crime of hypothecation of customers' securities is not the intent to defraud as in the ordinary crime of larceny but the intent to knowingly do the wrongful act prohibited by the statute, and it was proper to charge to that effect. However, the mere doing of the act is not a crime in the absence of the intent aforesaid.

(3) Same—When brokers not in actual or constructive possession of security.

The defendant did not have actual possession of the bonds hypothecated and did not have constructive possession thereof because under the circumstances his firm had no right to possession. It follows that as the defendant had no possession of the securities, actual or constructive, he did not pledge them within the meaning of the statute and it was error for the court to charge to the contrary. The error in such charge is available to the defendant although no exception thereto was taken, as the point arises on his motion for the court to advise the jury to acquit.

JAYCOX, J., dissents.

APPEAL by the defendant, Morton Atwater, from a judgment of the Supreme Court, rendered against him on the 31st day of January, 1919, convicting him of the crime of " hypothecation of customers' securities," in violation of subdivision 1 of section 956 of the Penal Law, after a trial at the Dutchess County Trial Term.

Also appeal by the defendant from an order entered in the office of the clerk of said county on the 30th day of November, 1918, dismissing his appeal from the order denying his motion to change the place of trial.

*Frank B. Lown* (*Charles Morschauser* and *John E. Mack* with him on the brief), for the appellant.

*Raymond E. Aldrich, District Attorney (Edward K. Haas, Assistant District Attorney, with him on the brief), for the respondent.*

BLACKMAR, J.:

On the 21st day of June, 1918, the defendant, together with Gilbert F. Foote, Harold W. Sherrill and Eliot Atwater, composing the firm of Atwater, Foote & Sherrill, of Poughkeepsie, was indicted by the grand jury of Dutchess county upon six counts—three for grand larceny in the first degree, two for hypothecation of customers' securities, and one for receiving stolen goods. The defendant was tried separately. At the close of the evidence the district attorney elected to rely upon the counts of grand larceny in the first degree committed by a bailee or broker (embezzlement), and hypothecation of customers' securities. The other counts were dismissed. The jury convicted the defendant of the crime of hypothecation of customers' securities. This was an acquittal of the charge of grand larceny, and the verdict of the jury was equivalent to a finding that there was no criminal intent to defraud on the part of the defendant.

The firm of Atwater, Foote & Sherrill was engaged in the brokerage business in the city of Poughkeepsie. When the government attempted to float the Liberty Loans, the firm (whenever I use this word I mean the firm of Atwater, Foote & Sherrill) engaged in the attempted flotation. They received a number of subscriptions for the first Liberty Loan of three and one-half per cent bonds. When the second Liberty Loan was floated they took subscriptions from their customers, aggregating about $93,000, many of them being for small amounts, and received the initial payment of two per centum thereof. The defendant had general charge of the subscriptions. As the subscription blanks were signed by the customers, they were laid upon his desk, and he made notations upon them, showing whether they were to be paid in full or

in installments. He also noted, in his own handwriting, the bank through which the subscriptions were to be taken. Instead of turning over to the banks the subscriptions of its customers, the firm, on various dates from October 16, 1917, to October 27, 1917, subscribed for various amounts of Liberty bonds in its own name at four local banks. At the Merchants National Bank the firm subscribed for bonds aggregating in amount $13,250; and as the subscriptions were made the two per cent thereon was paid by the firm to the bank. At about the same time the subscriptions for the remainder of the $93,000 were made to three other banks. On some of the firm's subscriptions it was stated that the subscription was made on behalf of the clients of the firm, and on all of them a notation was made of the denomination of bonds required, in accordance with the amounts of the customers' subscriptions.

According to the government plan, the first payment after the initial two per cent was to be made upon the subscriptions on the 15th of November, 1917. On November fourteenth a collateral note, due in three months, was given by the firm to the Merchants National Bank for the sum of $12,985, being ninety-eight per cent of the subscription made at that bank. This was credited to the firm on the books of the bank, less discount, and on that day the firm gave its check to the bank for the sum of $12,985, with instructions to use the money to take up the bonds. The check was signed by Sherrill. Who signed the note is in doubt. The note was subsequently destroyed and there is no definite evidence on this subject; but there is no doubt that the defendant knew of and participated in this transaction. The bonds were then unissued and the bank was to receive the bonds when issued and hold them as collateral security for the payment of the firm's note.

Among the subscriptions that were taken through the Merchants National Bank were those of the seven ladies whose names are mentioned in the indictment, the total amount of whose subscriptions aggregated $2,350. The remainder of the

subscriptions at this bank were made by twenty-eight other customers in small amounts; so that the subscription which the firm made at this bank was intended to supply the bonds for the subscriptions of thirty-five different customers.

It sufficiently appears that the subscriptions of the seven ladies mentioned in the indictment, with the possible exception of one or two, were fully paid to the firm on or before the 15th of November, 1917, which was the day after the note collateral in form was given to the bank.

The bonds came to the bank on or about the twenty-seventh or twenty-eighth day of November; and, as was customary with securities held as collateral, they were placed in an envelope by the bank and marked with the name of the firm. There was, however, no allotment of them among the original subscribers, for the bank knew no one in the transaction but the firm. It was arranged between the firm and the different banks that the firm might, by making payments to the bank on the note, release such of the bonds as the firm desired. And as the customers called for the bonds this was done, and the bonds were taken from any one of the banks as suited the convenience of the firm; but the money paid to the firm by the seven ladies was not (except the original two per cent) used to release bonds from the lien of the bank, but remained in the coffers of the firm. Matters continued in this condition until the 13th of February, 1918, when the note fell due. The defendant, representing the firm, then went to the bank, gave a renewal note for the same amount, to wit, $12,985, due in ninety days, and paid the discount thereon. This note, like the first, was a collateral note in the form usually used among bankers, and receited that $13,250 in amount of second Liberty bonds were pledged for its payment. The bonds were never in the physical possession of the defendant's firm; they had never been allocated to the customers' subscription; and from the time of issuance they were at all times subject to the lien of the bank for ninety-eight per cent of their purchase price.

It was for this act of February thirteenth, alleged to be an hypothecation of bonds belonging to the seven ladies, that the defendant has been indicted and convicted.

On the first of March following, the defendant discovered that two of his partners had been speculating under fictitious accounts. It is enough to say that finally, by the aid of expert accountants, it was discovered that the two partners by dis-honest acts had made way with about $750,000 and left the firm hopelessly insolvent. The defendant personally was in-nocent and ignorant of these transactions, and he himself was ruined financially. He supposed at the time the money was borrowed from the bank and the note was renewed, and until the March following, that the firm was fully solvent. When the note given in February fell due, the bonds held by the bank as collateral were sold to satisfy its lien, and the seven ladies lost their funds which they had paid the firm on their bond subscriptions.

The appellant with great earnestness urges that the court erroneously instructed the jury on the subject of intent. We think the charge was accurate. When submitting to the jury the count of grand larceny, the court charged that to constitute such crime the People must establish that the acts were committed "with the criminal intent to deprive the true owners of their property and to appropriate it to the use of himself or some other person." When, on the other hand, he submitted the count of "hypothecation of customers' securities," he charged that "if at the time he hypothecated those bonds he knew that they were the bonds of these customers mentioned in this indictment, and that the bonds were paid for, then this case is made out." Again: "Should you find that he knowingly, intentionally, realizing what he was doing, knowing that these securities belonged to the customers, hypothecated them for the debt of the firm, he is guilty of the charge of hypothecation, although he was innocent upon the other charge." The justice discriminated accurately between the intent necessary to con-

stitute the crime of grand larceny and that necessary to constitute the crime of hypothecation of customers' securities; and at several times during the charge, and when the jury came back and asked that the court again define the difference between hypothecating bonds and grand larceny, the same instruction was given, always charging that the intent to do the act must be accompanied by knowledge " that the property belongs to the customer, and that it is fully paid for, that the broker has no lien on it." Nowhere did the court charge that the mere act of hypothecating the securities that the customers owned constituted the crime; but that it was the knowledge on the part of the defendant that the bonds were paid for and belonged to the customers that stamped the act as criminal.

When we compare the statute defining larceny (Penal Law, § 1290) with that defining the crime of hypothecation of customers' securities (Penal Law, § 956) the different nature of the intent necessary to constitute the two crimes is plain. The statute defining larceny (§ 1290) begins: " A person who, with the intent to deprive or defraud the true owner of his property, or of the use and benefit thereof, or to appropriate the same to the use of the taker, or of any other person," etc.; whereas no such words are found in section 956. Undoubtedly a criminal intent is necessary to constitute the crime of which the defendant was convicted; but the criminality of the intent consists of the intent to do the prohibited act with *knowledge* of all the facts constituting the crime—in this case that the bonds were the property of the customers, in the possession of the defendant for safekeeping or otherwise, and that the defendant had no lien thereon. (People ex rel. Hegeman v. Corrigan, 195 N. Y. 1.) The intent to defraud, which is an element of the crime of larceny, is not a constituent of the crime of hypothecation of customers' securities; it is the intent to knowingly do the wrongful act prohibited by the statute.

When the act is a purely innocent one, forbidden by the Legislature from considerations of public policy, no criminal

intent is necessary. Doing the act alone is the crime, and it is not excused by ignorance or mistake of fact. (People v. Werner, 174 N. Y. 132.) I think, however, that the crime of which the defendant was convicted does not fall within that category. The object of the statute was to protect the property of customers, left in possession of a broker for safe-keeping or otherwise, from loss by the unauthorized and, in the domain of morals, wrongful act of the broker. The statute is aimed at such wrongful act. The criminal intent is doing the act with the knowledge of the violated rights of the customer. It is the intent to do this wrongful act, and not the intent to defraud which characterizes most crimes against property, that satisfies this criminal statute. I think the charge of the court was accurate and discriminating.

The statute under which the defendant was convicted reads as follows:

" § 956. Hypothecation of customers' securities. A person engaged in the business of purchasing and selling as a broker stocks, bonds or other evidences of debt of corporations, companies or associations, who

" 1. Having in his possession, for safe keeping or otherwise, stocks, bonds or other evidences of debt of a corporation, company or association belonging to a customer, without having any lien thereon or any special property therein, pledges or disposes thereof without such customer's consent; or    *    *    *

" Is guilty of a felony, punishable by a fine of not more than five thousand dollars or by imprisonment for not more than two years, or by both.

" Every member of a firm of brokers, who either does, or consents or assents to the doing of any act which by the provisions of this or the last preceding section is made a felony, shall be guilty thereof." (Added by Laws of 1913, chap. 500.)

The clause omitted from the quoted statute refers to securi-

ties upon which the broker has a lien and is irrelevant to the case at bar.

In order to constitute the crime, possession of the securities for safekeeping or otherwise by the defendant and a pledging of them are necessary.

The defendant never had these bonds in his actual possession, and, so far as the record shows, he never saw them. The bonds were not obtained on the subscriptions made by the customers. The defendant's firm for convenience and economy of labor made its own subscriptions through the bank in denominations fit to meet the customers' subscriptions. Using the two per cent deposited by the customers, it borrowed the remaining money from the bank on a collateral note and gave its check to the bank to pay for the bonds. When the bonds were allotted by the government they came into the possession of the bank as pledgee under the collateral note, the discount of which produced the money to pay for them. A large number of bonds were held in the local banks, and as the customers from time to time called for them the firm paid enough to release such as were wanted, and handed them to the customers. The note in the Merchants Bank fell due on February 13, 1918. The seven ladies had long before paid the firm for their bonds, and this, we must assume from the verdict rendered under the law as charged by the court, was known to the defendant. The defendant went to the bank and renewed the note, leaving the bonds with the bank as pledgee. Was the firm in possession of the bonds within the meaning of the statute? It is urged by the appellant that the statute refers to actual possession. On the other hand, the district attorney claims that constructive possession satisfies the statute. I quote some remarks of Justice Lamar in National Safe Deposit Co. v. Illinois (232 U. S. 67), not as tending to solve the question, but as showing its difficulties: " This is one of that class of cases which illustrate the fact that, both in common speech and in legal terminology, there is no word more ambiguous in its meaning than

Possession. It is interchangeably used to describe actual possession and constructive possession, which often so shade into one another that it is difficult to say where one ends and the other begins."

Several of the cases cited by the district attorney refer to possession of real property. (Churchill v. Onderdonk, 59 N. Y. 134; Weston v. Stoddard, 137 id. 119; Brown v. Volkening, 64 id. 76; Brown v. Crossman, 206 id. 471.) It is true that constructive possession, or, in other words, possession in law, follows the legal title to real property, and often, as in partition actions and in actions to determine the title to real property, the term "possession" is satisfied by constructive possession. But these cases have no application to the construction of a statute defining a crime relating to personal property. People v. Britton (134 App. Div. 275) was a case of larceny by an agent, trustee or officer of a corporation, and it was decided that actual possession was not essential. But in that case the court was considering a crime under subdivision 2 of section 528 of the Penal Code, which is now subdivision 2 of section 1290 of the Penal Law. The section reads: "Having in his possession, *custody,* or *control,* as a bailee * * *." The word "custody" and "control" are relied on in the opinion of the court as requiring the decision that actual possession was not necessary. In section 956, under which defendant was convicted, the words "custody" and "control" are omitted and the word "possession" only is used.

I am not prepared to say that actual physical possession is always necessary to constitute the crime under section 956. For instance, if the broker had these securities in a safe deposit vault and the pledge was made by a clerk under his direction, or if he had placed them with the bank for safekeeping and had gone to the bank and pledged them without taking physical possession, or if he had purchased and paid for them through the bank and they had come into the possession of the bank, holding them simply as custodian for him, and he had gone to

the bank and pledged them even without taking them into his .physical possession, I think the statute would be satisfied. In all these cases the broker has the present right to actual physical possession. But in the case at bar the defendant not only did not have physical possession, but he never had the right of possession as against the bank. I do not think constructive possession can exist without the right to possession. Undoubtedly if securities belonging to a broker were in his safe deposit vault or in the hands of an employee he would have constructive possession of them. In such cases he has the right to immediate possession, and can at will reduce them to physical possession. When the original note was given on November 15th, the customers had not paid for the bonds and the transaction at that time did not violate the statute. The bonds came to the bank subject to its lien for 98 per cent of their face value. There never was a time when the firm had the right to go to the bank and take possession of them. As between the firm and the bank, the bank had the special property in the bonds, and the firm could get possession only by the payment of the note. We are construing a statute which creates a new crime, and I think the word " possession " should be given its usual meaning. It was not for nothing that the Legislature omitted the words " custody " and " control " which were then before them in the definition of larceny by a bailee or agent. The best reflection I can bring to bear on the subject tends to the conclusion that the bonds which had always been subject to the lien of the bank for 98 per cent of their face value, and which at no time had the defendant the right to take into possession as against the bank, cannot be said to have been in the possession of the defendant.

The remaining question is whether the defendant pledged the bonds. On proper analysis I think this question is practically the same as the one just considered. If the defendant had possession he pledged them, otherwise not. The district attorney cites the case of Van Blarcom v. Broadway Bank (9

Bosw. 532), to the effect that when a bank already holds securities in pledge, the pledge can be extended to other obligations by oral agreement. I see no reason to doubt this proposition; but it has no application to this case. Let us consider what the defendant did on the 13th of February, 1918. The bonds were already in the bank subject to the bank's lien for 98 per cent of their value, upon a collateral note given by the defendant. On that date the defendant went to the bank and gave another collateral note in place of the one already there. The legal relation of the parties was not changed at all by this act, except that the time for the payment of the note was extended. No additional burden was put upon the bonds at that time. If the defendant had done nothing, the legal relation would have been exactly the same except that the bank would have had the right to foreclose immediately. The renewal note had no other effect than to postpone the time when the bank could realize upon the securities. We must take the facts as they are. True, the defendant might have paid the note and taken the bonds into his possession and rehypothecated them, but he did not do it. The statute forbids the imposing of a lien by way of pledge on the securities belonging to a customer, or the disposing of them. The defendant did neither one of these two things. He imposed no lien upon the bonds at that time. He at that time did nothing affecting the ownership or the interest of the customers in the securities. He paid at that time the discount for the extension of the note. The customers had exactly the same rights in the bonds as they had before— neither more nor less. The court charged the jury that the bonds were hypothecated at that time, and I find no exception to that charge. The point is available, however, upon the motion of the defendant to advise the jury to acquit. If my view of this case is correct, the crime was not proved, and, therefore, the motion to acquit should have been granted, and the exception to the refusal to grant it is fatal to the conviction.

I recommend that the judgment be reversed on the facts because the facts alleged in the indictment are not proved, and on the law because the facts actually proved do not constitute a crime, and that the indictment be dismissed.

RICH, PUTNAM and KELLY, JJ., concur; JAYCOX, J., dissents.

Judgment of conviction reversed on the facts because the facts alleged in the indictment are not proved, and on the law because the facts actually proved do not constitute a crime, and indictment dismissed.