## SEYMOUR v. UNITED STATES.
### No. 10113.

Circuit Court of Appeals, Eighth Circuit.
April 22, 1935.

578

See, also (D. C.) 50 F.(2d) 930.

William C. Dorsey, of Omaha, Neb., and Thomas S. Allen, of Lincoln, Neb., for appellant.

Charles E. Sandall, U. S. Atty., of Omaha, Neb. (Ambrose C. Epperson, Asst. U. S. Atty., of Omaha, Neb., Barlow Nye, Asst. U. S. Atty., of Lincoln, Neb., and Frederick G. Hawxby, Asst. U. S. Atty., of Omaha, Neb., on the brief), for the United States.

William E. Shuman, of North Platte, Neb., amicus curiæ.

Before STONE, SANBORN, and FARIS, Circuit Judges.

STONE, Circuit Judge.

This is an appeal from a conviction for perjury in an investigation before a subcommittee of the Senate.

On April 10, 1930, the Senate passed Resolution 215 providing a special committee to investigate campaign expenses of candidates for the United States Senate. The resolution provided that hearings might be before the committee or any subcommittee appointed by it and at such times and places ("either in the District of Columbia or elsewhere") as the committee might deem proper. The resolution provided that the chairman of the committee or any member of a subcommittee might administer oaths to witnesses. The investigations were expressly directed as to all facts concerning such campaign expenditures or promises or uses of patronage as "would not only be of public interest but which would aid the Senate in enacting any remedial legislation or in deciding any contest which might be instituted involving the right to a seat in the United States Senate."

Acting under the above resolution, Senator Nye (as a subcommittee) held a hearing at Lincoln, Neb., on July 21, 1930, for the purpose of investigating such campaign expenditures in connection with the selection of a United States Senator in Nebraska. At that hearing, appellant was sworn as a witness by Senator Nye, and testified. Certain answers given by appellant in the course of this testimony are the bases of the eight counts in this indictment, each charging perjury.

At the conclusion of the testimony, the court directed a verdict for appellant upon three counts (5, 7, and 8) and, upon motion of appellant then made, dismissed those counts. The jury found appellant guilty on each of the remaining five counts, and the court imposed one general sentence of six months' imprisonment and a fine of $100. From such judgment, this appeal is brought by appellant who presents here five claimed errors.

## Adequacy of the Oath.

The first contention is that Senator Nye had no authority to administer the oath resulting in the testimony of appellant. The main argument favoring this contention is as follows: That the statute (USCA title 4, § 7) requires that "all offices attached to the seat of government shall be exercised in the District of Columbia, and not elsewhere, except as otherwise expressly provided by law"; that the Congress and its committees are within the above statutory expression "offices attached to the seat of government"; that a resolution of a single house of Congress is not a "law" as provided by the statute; that, therefore, no authority existed in the committee under Resolution 215 to act outside the District of Columbia, and hence the oath administered by Senator Nye to appellant at Lincoln was without authority.

Assuming, without examining or deciding, that the Congress and the committees of either or both houses are within the above statute, this contention is unsound because either house has the constitutional power to conduct separate investigations for proper purposes, and the Congress has no authority to limit the future exercise of that constitutional power. The power exists as "auxiliary" to its express powers, being "necessary and appropriate to make the express powers effective" (Sinclair v. United States, 279 U. S. 263, 291, 49 S. Ct. 268, 271, 73 L. Ed. 692; McGrain v. Dougherty, 273 U. S. 135, 160–176, 47 S. Ct. 319, 71 L. Ed. 580, 50 A. L. R. 1; In re Chapman, 166 U. S. 661, 671, 672, 17 S. Ct. 677, 41 L. Ed. 1154). The inability of Congress to limit the future exercise of such constitutional power is certain (Jurney v. MacCracken, 294 U. S. 125, 55 S. Ct. 375, 79 L. Ed. ——, decided Feb. 4, 1935; Reichelderfer v. Quinn, 287 U. S. 315, 318, 53 S. Ct. 177, 77 L. Ed. 331; Sinclair v. United States, 279 U. S. 263, 295, 49 S. Ct. 268, 73 L. Ed. 692; McGrain v. Daugherty, 273 U. S. 135, 172, 47 S. Ct. 319, 71 L. Ed. 580, 50 A. L. R. 1; Burton v. United States, 202 U. S. 344, 369, 26 S. Ct. 688, 50 L. Ed. 1057, 6 Ann. Cas. 362; In re Chapman, 166 U. S. 661, 671–672, 17 S. Ct. 677, 41 L. Ed. 1154, and see, for same principle applied to state Legislatures, Pierce Oil Corp. v. City of Hope, 248 U. S. 498, 501, 39 S. Ct. 172, 63 L. Ed. 381; Texas & N. O. R. R. Co. v. Miller, 221 U. S. 408, 414, 31 S. Ct. 534, 55 L. Ed. 789; Connecticut Mutual Life Ins. Co. v. Spratley, 172 U. S. 602, 621, 19 S. Ct. 308, 43 L. Ed. 569; Newton v. Mahoning County, 100 U. S. 548, 559, 25 L. Ed. 710). Resolution 215 was an appropriate method of exercising such power, and it expressly provided the methods of such exercise, one of which was that such hearings could be held outside the District of Columbia.

## Materiality of the Subject of Inquiry.

The second contention is that the matter relied upon to prove appellant's answers untruthful was beyond the lawful scope of the committee's power of inquiry, and, therefore, not a "material matter" within the meaning of the perjury statute (USCA title 18, § 231) which requires that the false statement must be concerning a "material matter." The supporting argument is that the power of Congress or a committee thereof to investigate depends upon and flows from the power to legislate upon the subject investigated; that Congress has no constitutional power to legislate as to primary elections for nomination of United States Senators; and that the investigation here involved was solely concerning such a primary election. It is true that regulation of such primary elections has been declared beyond the national power under clause 1, § 4 of article 1 of the Constitution, which gives Congress control over "the times, Places and Manner of holding Elections for Senators * * *" (Newberry v. United States, 256 U. S. 232, 41 S. Ct. 469, 65 L. Ed. 913), and it is true that the inquiry here was concerned wholly with a primary election; that is, it may be conceded that Congress had no power to legislate for the purpose of regulating primary elections, such as involved in this inquiry. This leaves for inquiry that part of this contention which declares that Congress or its committees cannot investigate except as to matters which may be the subject of legislation by it. If by legislation is meant enactment of statutes, the statement is unsound (Barry v. United States ex rel. Cunningham, 279 U. S. 597, 613, 49 S. Ct. 452, 73 L. Ed. 867). The actual limitation is that congressional investigation must be confined to matters subject to action by Congress or by the house conducting the investigation. Congress and the separate houses have powers outside the enactment of statutes. Clause 5 of section 2 of article 1 clothes the House of Representatives with the "sole power of impeachment"; clause 6 of section 3 of article 1 gives the Senate "sole power to try all impeachments"; clause 1 of section 5 of article 1 makes each house the

judge of the elections, returns and qualifications of its own members, and gives power to compel attendance of members; clause 2 of the same section gives each house power to determine its rules of proceedings, to punish and to expel members; clause 1 of section 6 of article 1 protects freedom of attendance and of speech by members of either house; all of these powers may be and some of them must be exercised by a single house, which has no power alone to enact a statute. Where the exercise of any constitutional power of Congress or of either house is involved, investigation of matters germane to the proper and intelligent exercise thereof may be subjects of investigation by such house or committees thereof under its authority (Barry v. United States ex rel. Cunningham, 279 U. S. 597, 613, 616, 49 S. Ct. 452, 73 L. Ed. 867; Kilbourn v. Thompson, 103 U. S. 168, 190, 26 L. Ed. 377), and no concurrence nor aid is necessary from the other house or elsewhere (Reed v. County Commissioners, 277 U. S. 376, 388, 48 S. Ct. 531, 72 L. Ed. 924). The limitation of power of investigation is that it must be germane to some matter concerning which the house conducting the investigation has power to act (whether such action be enactment of statutes or something else), and not a mere inquisition into the private affairs of the citizen (Jurney v. MacCracken, 294 U. S. 125, 55 S. Ct. 375, 79 L. Ed. ——, decided Feb. 4, 1935; Sinclair v. United States, 279 U. S. 263, 291–294, 49 S. Ct. 268, 73 L. Ed. 692; McGrain v. Daugherty, 273 U. S. 135, 176–180, 47 S. Ct. 319, 71 L. Ed. 580, 50 A. L. R. 1; In re Chapman, 166 U. S. 661, 668–672, 17 S. Ct. 677, 41 L. Ed. 1154; Kilbourn v. Thompson, 103 U. S. 168, 194, 195, 26 L. Ed. 377).

■ Applying the above rules to the present case, it is necessary to ascertain if the investigation of this primary election was germane to the exercise of any constitutional power possessed by the Senate. The resolution states its objects to be ascertainment of facts which "would not only be of public interest but which would aid the Senate in enacting any remedial legislation or in deciding any contest which might be instituted involving the right to a seat in the United States Senate." Whatever lack of authority there may be to prosecute an investigation for the "public interest" or to aid the Senate "in enacting any remedial legislation" relating to primary elections, there can be no doubt of the power of the Senate to determine contests involving the right to seats in the Senate because it has an expressed constitutional authority to judge of the elections, returns, and qualifications of its own members. Article 1, § 5, cl. 1. The inquiry here concerning improper methods of securing nominations is certainly germane to the proper exercise of such power. That the Senate has and has exercised such power to deny seats to members who procured party nominations by what the Senate deemed improper means of expenditures is exemplified in the effective denial of seats to Senators Newberry of Michigan and Smith of Illinois. This is one effective method of preventing the purchase of seats in the Senate. Nor does the exercise of this power of investigation depend upon the existence of an actual contest or proceeding to deny a seat in the Senate. One of the broad purposes of the grant of the constitutional power was to protect the integrity of the membership of the Senate. This purpose is obviously served by investigations made closely connected in time and fact with the acts which might form a basis for senatorial action affecting the seating of a member.

■ Appellant urges, also, that the subject-matter of the immediate inquiries upon which the indictment is based were not germane because they related to expenditures for a man who never became a candidate at the primary. The immediate inquiry had to do with expenditures by W. M. Stebbins to and for the benefit of George W. Norris of Broken Bow, Neb., in order to induce Norris to become a candidate in the Republican primary for United States Senator, wherein Stebbins and Senator George W. Norris of McCook, Neb., were candidates. The obvious purpose of Stebbins was not merely to have a third candidate in the race, but it was to have a third candidate who had precisely the same name as his real opponent, Senator George W. Norris of McCook, Neb. This confusion of names would naturally have the effect of injuring Senator Norris, who was well known in Nebraska, by drawing mistaken votes to George W. Norris, who was a grocer's clerk at Broken Bow. Whether a man who would resort to such political trickery should, if successful, be accorded a seat in the Senate would be a matter for the Senate to determine. The fact that three days before this hearing the Supreme Court of Nebraska had disqualified Norris of Broken Bow from contesting in the Republican primary (because his filing therefor was too late under the state statute) bears upon the success of

the scheme but has no effect upon the character and methods of Stebbins who did all he could to promote it. The inquiry as to this transaction was germane to the investigation concerning expenditures in connection with that primary.

## Joinder of Separate Counts in Indictment.

The next contention of appellant is that there was but one crime charged and that the prosecution should have put "all the questions and answers assigned as perjury into one count, and proof of one or more would have been sufficient, although proof as to others might have been insufficient or entirely lacking." This contention is not well grounded. The matters covered by the indictment related to various alleged false statements in answer to questions concerning different matters. The first count referred to statements that appellant made concerning his "contact with" the primary campaign and having conferences concerning such campaign. The second count covered statements that he knew of money being available for use in the campaign only from the newspapers, that he had spent no money in that connection, and that no money or credits had been placed at his disposal for such use. The third count concerned statements that he had no knowledge of contributions for or against any candidate. The fourth count concerned statements that he had had no part in encouraging the candidacy of George W. Norris of Broken Bow. The sixth count concerned statements that he had taken no part in any conferences relating to any political situation in Nebraska involving the candidates for Senator. In only one particular (having conferences concerning the primary), which appears both in counts 1 and 6, was there any duplication of subject-matter and, as to that, the government was compelled to elect the count upon which it would rely, and selected count six. Thus it appears that the statements covered by the several counts referred to different matters of inquiry. Neither the circumstances that all referred to the same general subject of inquiry or that all were made at the same hearing prevents each from being a separate and distinct crime punishable as such. The commission of perjury as to one matter does not absolve the witness or afford him immunity as to all other matters covered by his testimony at the same hearing. The obligation to testify truly and the penalty for false swearing is present as to every material answer given

by him. While there is a sound discretion as to such matters in the trial court [Pointer v. United States, 151 U. S. 396, 14 S. Ct. 410, 38 L. Ed. 208; Morris v. United States, 161 F. 672 (C. C. A. 8)], it would seem there would have been more ground for attacking the indictment as duplicitous had all of these matters been joined in one count than there is to attack the statement in separate counts.

Another reason why this contention is unavailing is that there was but one sentence which was within what might have been imposed upon any one of the five counts upon which there was conviction. Powers v. United States, 223 U. S. 303, 312, 32 S. Ct. 281, 56 L. Ed. 448. The only prejudice alleged was in "giving the jury the impression that he was charged with six separate perjuries, when in fact he had committed, if any, only one." Actually, each count presented the charge of a separate perjury so that the jury received no false impression. If such impression had been erroneous, all possible harmful effect upon appellant was nullified by the sentence imposed.

### Correction of Testimony.

Appellant testified as follows: That about a month after the hearing before Senator Nye, at Lincoln, he went to Denver to assist in conducting the Republican campaign for election of Senators in several Western States; that a few days later he read in the newspapers of another inquiry being made by Senator Nye, in Nebraska, which referred to testimony he had given at Lincoln; that he conceived a meaning was being attached to his testimony which he had not intended; that he called up Senator Nye and said his testimony was true as he understood it but if the committee was placing a different construction on it he wanted to appear before the committee and explain his testimony, and would go to Lincoln or Washington or anywhere else, but could not leave just then as he was alone at the Denver headquarters; that Senator Nye said he could do nothing for him, but suggested he put his request in a telegram; that he did so in a wire (sent September 24, 1930) as follows:

"Senator Gerald P. Nye, Cornhusker Hotel, Lincoln, Nebraska.

"Am very much surprised to read in todays press reports of testimony before your Committee regards Primary Campaign in Nebraska stop In justice to the Committee and myself I will be glad to appear before

the Committee at Washington any time after the middle of November which may suit your convenience stop At present my time is fully occupied with duties requiring my personal presence here.

"Victor Seymour."

The court refused a request as follows: "The jury are instructed that a bona fide but incompleted attempt to correct false testimony may show absence of criminal intent essential to perjury."

It is the refusal of this request based upon the above evidence that appellant contends is error. The request was properly refused. We must take (as the trial court was compelled to), the request to mean just what it says. That meaning clearly is that if a good-faith attempt to correct false testimony is made, such attempt may show lack of intent to commit perjury. That is not true in fact or law. A perfectly serious attempt may be made to correct testimony knowingly falsely given. Such an attempt has no effect upon the existence of perjury in knowingly giving the false testimony. When false testimony concerning a material fact has been knowingly given, perjury has become and continues to be an accomplished and completed thing. This request may have been intended to present the situation of false testimony mistakenly given, but that is not its meaning. Had the court given the request, counsel would have had sufficient basis therein to have argued that even if appellant knowingly swore falsely before Senator Nye, yet a subsequent attempt to rectify his testimony might be considered as showing an absence of criminal intent.

The situation is that, if false material testimony was knowingly given, perjury had been committed and nothing thereafter done could alter that situation, while if such testimony was the result of an innocent mistake it was not perjury. That issue was clearly presented in the charge. Appellant's contention was that his answers were true in view of his understanding of the questions. The essence of the controversy was the intent of appellant, and that depended upon his understanding of the meaning of the questions. The court charged as follows: "Then there may be instances where the questions are very plain, easily understood, simple in language, definite in meaning, and the answers may be very simple, the meaning of which is unmistakable. Then there may be instances where the questions are involved, or are long, or where unusual words are used, where the relation-

ship of phrase to phrase and clause to clause may be such that there may be difficulty in gathering the exact scope and meaning of the question, and in all cases the answer has to be considered under the circumstances in which it is given. So also, an answer itself, may be involved and difficult to put in words or hard to understand. And we are not all alike; some have the gift of expression and clarity and others have difficulty in expressing themselves on any occasion and might have more difficulty when under oath and trying to be exact. I am stating this in calling your attention to the statute which says that you are to consider, in effect, whether the testimony as given was believed to be true, because the belief must be considered in view of the circumstances under which the person made the statement. Of course it is proper to consider the intelligence, the experience, the education, the understanding of the person who given [gives] the testimony and his comprehension of the questions asked him and his knowledge of the meaning of the words which he uses in giving his answers. But after considering all the circumstances, the final and legal test is not what the words might ordinarily mean, not what some one else claims they mean, not what the jury thinks the words mean, and not even the meaning which the words have as definited [defined] in the dictionary, although the ordinary meaning of such words is proper for you to consider in ascertaining the meaning which was used by the one giving the testimony. But the test that you must consider and use, is whether or not the defendant believed the testimony as given was true at the time and in the sense that he understood the questions and in the sense he gave the answers constituting his testimony."

In another place in the charge and after calling attention to various words used in the questions, the court said: "In considering the meaning of the words as used you have a right to consider the common usage and meaning, or the various common meanings or usages of such words, and the more exact meaning as defined by the dictionary, but even after considering that, still the test for you is, as I have said, to find out the meaning in which the defendant who gave the testimony intended in his answers and understood in the questions where such words were used."

Again in regard to some particular expressions used in connection with the testimony covered by count 2, the court said:

"I am not undertaking to bring to your attention the meaning of all the words in all of these questions and answers or all the meanings of those which might be considered ambiguous or indefinite, but I am trying to call to your attention the fact that it is for you to determine the meaning of the language and that if there is an ambiguity or indefiniteness in the meaning of the words used, that it is for you to say the sense or meaning in which Mr. Seymour gave his testimony and the belief that he had as to the meaning of the words which were used in the questions and answers."

## Sufficiency of Evidence.

■■■ Appellant attacks the sufficiency of the evidence to sustain a conviction upon any of the counts. Since the sentence was a single sentence and not upon separate counts, and since the extent of sentence was within a conviction for any one count, the judgment must be sustained if the evidence on any count was sufficient. This statement is made to avoid a fruitless discussion of the evidence as to each of the five counts upon which appellant was convicted, since the evidence is clearly sufficient as to the conviction under count 4. This count charged perjury in a statement that appellant had "had no part in encouraging the candidacy of one George W. Norris of Broken Bow, Nebraska, for the Republican nomination for United States Senator from Nebraska, at the Primary election held the twelfth day of August, in the year nineteen hundred thirty." The proof consisted in an answer and question as follows: "Q. 13. You had no part then, in view of what you have said, in encouraging the candidacy of George W. Norris, of Broken Bow? * * * A. Not a bit."

This testimony had been immediately preceded by inquiries concerning Norris of Broken Bow which had resulted in appellant testifying that he had never seen and never heard of Norris until he "saw his filing in the paper." The testimony, even by appellant, was: That as a representative of Stebbins he had gone to Kearney, Neb., for the purpose of "getting Norris of Broken Bow to become a candidate" for Senator in the Republican primary; that he had there met one Johnson and given him $50 for this purpose (this amount being later repaid appellant by Stebbins); that later he transmitted to Johnson $300 and a Liberty bond for $500 given appellant by Stebbins for that purpose; that these payments were "for campaign expenses of George W. Norris of Broken Bow." Obviously, the above evidence was ample to sustain a verdict that appellant knowingly swore falsely when, in answer to the question as to whether he had taken any part in "encouraging the candidacy" of said Norris, he had answered, "Not a bit."

■■■ Appellant argues that whether he had any part in encouraging the candidacy of Norris of Broken Bow was immaterial to the subject of the committee's inquiry. He contends that if there is any fault in a situation which leads to confusion of voters by the candidacy of men who have the same name it is the result of the primary law which permits such and it is not illegal. It may well be that such confusion is not illegal. It may be entirely proper and it is certainly permissible under the Nebraska primary election law for persons with identical names to file for the same office. It may not be illegal even for a candidate to create such confusion by inducing a person to enter the race who has the same name as an opponent and such action may be legal (not unlawful) even though done for the purpose of confusing the voters to the harm of such opponent and, therethrough, deriving a benefit to himself. Be this as it may, it remains that it is a tricky procedure repellent to any sense of fair play and, more important, that it interferes with and prevents expression of the real sentiment and wish of the voters. It is deceptive, is intended to be so, and would entirely fail in its purpose were it not so. Here, the sole interest of Stebbins in having Norris of Broken Bow come into the senatorial primary was to forward his own candidacy by weakening that of his opponent, Senator Norris. This was purposed to be accomplished solely by confusing voters who intended to vote for Senator Norris into voting for the other Norris because of the exact similarity of names upon the ballot. The extent of such deception would be impossible of proof and might result in the selection of Stebbins when in fact a majority of voters at the primary might have favored Senator Norris though many of them actually voted for the other Norris under the misapprehension, actively induced by Stebbins, that they were voting for Senator Norris. A selection so obtained would be the defeat of the real will of the voters through a smart trick based upon deception of the voters. It would be a fraud upon the voters and result in a fraudulently acquired nomi-

584

nation and possibly election. The Senate is not confined to illegal actions as a basis for denying a seat in the Senate under the constitutional power to judge the "Elections, Returns, and Qualifications of its own Members" (article 1, § 5, cl. 1), and its action thereunder is "beyond the authority of any other tribunal to review." Barry v. United States ex rel. Cunningham, 279 U. S. 597, 613, 49 S. Ct. 452, 455, 73 L. Ed. 867. It is clear that any kind of fraud in procuring an election or a party nomination which might result in an election would properly be material to an inquiry for information in connection with the power of the Senate to judge the elections, returns, and qualifications of its own members.

Appellant argues that the word "encouraging" in the question was so uncertain that it called for "his opinion or construction as to its meaning" and that he construed it as meaning "whether he had come into personal contact with Norris [of Broken Bow] or brought his personal influence to bear to persuade him to become a candidate," which he had not done and so answered. It was certainly an open question for the jury to decide whether, after having just denied knowing or hearing of Norris, appellant (who had actively co-operated to get Norris into the primary) did or could have thought that the question of whether he "had no part * * * in encouraging the candidacy" of said Norris meant what he said he understood it to mean.

The judgment must be and is affirmed.