**UNITED STATES of America**

**v.**

**Maurice ROSE, Appellant.**

**No. 11116.**

United States Court of Appeals
Third Circuit.

Argued Feb. 18, 1954.

Decided Sept. 14, 1954.

Hirsh W. Stalberg, Philadelphia, Pa. (S. Frank Laveson, Shapiro, Rosenfeld & Stalberg, Philadelphia, Pa., on the brief), for appellant.

J. Julius Levy, U. S. Atty., Scranton, Pa. (Isaiah Matlack, Sp. Asst. to Atty. Gen., on the brief), for appellee.

Before MARIS, KALODNER and STALEY, Circuit Judges.

KALODNER, Circuit Judge.

The defendant appeals from a judgment of conviction of perjury.[1] He was sentenced to a two-year term on five counts of an indictment arising out of his testimony before a Grand Jury in the Middle District of Pennsylvania in an investigation of alleged frauds against the United States in the operation of training schools for veterans (G.I. schools) under the Servicemen's Readjustment Act, 38 U.S.C.A. § 693 et seq.

On December 19, 1951[2] the Grand Jury questioned the defendant, Maurice Rose, with respect to a payment, by check, made to him on October 24, 1949, by the York Painters and Paperhanging Training School, Inc. ("School") in the sum of $10,583.04 on his invoice of October 14, 1949, for 256 kits of painters' and paperhangers' tools. The Veterans Administration had subsequently reimbursed the School for this payment.

In its interrogation of the defendant the Grand Jury sought to ascertain whether he had in any way connived with the School to defraud the Veterans Administration. It particularly sought to learn whether the October transaction was legitimate or fictitious; what had happened to the proceeds of the $10,-583.04 check; whether any of the pro-

---

1. 18 U.S.C. § 1621 reads as follows: "Whoever, having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true, is guilty of perjury, and shall, except as otherwise expressly provided by law, be fined not more than $2,000 or imprisoned not more than five years, or both."

2. The defendant appeared before the Grand Jury on three subsequent occasions but the indictment on which he was tried concerned only his testimony on December 19, 1951.

ceeds was placed in a safe deposit box. The defendant's testimony covered other matters besides the statements on which the indictment was subsequently found on February 5, 1952.

The indictment charged, in brief, that the defendant perjured himself as to material matters when he testified:

(Count 1) that he cashed a check for $10,583.04;

(Count 2) that he used part of the proceeds of the check to pay the Federal Wallpaper Company $1,500.00 in cash;

(Count 3) that he used part of the proceeds of the check to pay the Fidelity Paint Company $3,000.00 in cash;

(Count 4) that he put the balance of the money in a drawer in his bedroom;

(Count 5) that he did not have a safe deposit box.

The five counts were quite lengthy but they admittedly recited only a portion of the defendant's testimony before the Grand Jury on December 19, 1951.

In a motion filed before trial the defendant asked for the right to inspect his entire testimony before the Grand Jury on December 19th, assigning as his principal reasons the fact that he was suffering from diabetes and a heart ailment at the time he testified before the Grand Jury and because of his condition and the voluminous character of his testimony it was impossible for him to recall all of it; that the full text of his testimony would give it a meaning different from that charged in the indictment and would negate perjury, and that his counsel could not properly prepare or conduct his defense unless they could inspect the transcript of his entire testimony.

The defendant's motion was denied and the case proceeded to trial. At the close of the government's testimony the defendant moved for judgment of acquittal. On its denial the defense rested. The jury found the defendant guilty on all five counts. The defendant renewed his motion for judgment of acquittal and, in the alternative, for a new trial. Both motions were denied and following entry of judgment and commitment the defendant appealed.

The issues presented by the appeal may be summarized as follows:

1. Was there compliance with the standard of proof required to sustain a conviction of perjury with respect to each of the five counts of the indictment and did the trial judge err in charging the jury as to such standard of proof?

2. Did the trial judge err in denying defendant's 9th and 14th requests for charge?

3. Did the trial judge err in denying defendant's request to inspect the transcript of all his testimony before the Grand Jury on December 19, 1951, and his subsequent appearances?

On the score of the first issue it is the defendant's contention that the evidence, under applicable legal principles, was insufficient to sustain the jury's verdict of guilty as to each of the five counts of the indictment.

Under the circumstances it is necessary to consider one by one the five counts of the indictment with a view to determining whether the evidence adduced as to them was sufficient to sustain a conviction.

As to Count 1, which charged that the defendant committed perjury when he testified before the Grand Jury that he cashed a $10,583.04 check:

The pertinent testimony of the defendant before the Grand Jury on this phase of the case reads as follows:

"Q. What did you do with the check after you got it? A. In this case I got cash for this check.

"Q. Where did you get the cash? A. At the bank.

"Q. Who was with you when you got the cash? A. Myself.

"Q. Why did you cash a $10,000 check? A. Because I had bills to pay and some of the people that I did business with I used to pay in cash."

The testimony as to this Count, at the trial, was as follows:

Defendant had a checking account at the Northwestern National Bank of Philadelphia, Pennsylvania, in which there was a balance of $1,514.12 on October 25, 1949; during that day he came to the desk of Roland Kushmore, vice-president of the bank and told him that he desired to deposit a check for $10,-583.04 and "would like to withdraw a certain sum of cash"; Kushmore made out a deposit slip for $10,583.04 and a check for $3,534.72 which the defendant signed; simultaneously the $10,583.04 check was deposited and defendant cashed the $3,534.72 check;[3] at the time the defendant also advised Kushmore that he desired to have certified his check in the amount of $5,870.08 to the order of Peerless Wallpaper and Paint Co. which was dated October 25, but was told that certification would have to be delayed until the $10,583.04 check had been cleared; the certification referred to was made on October 28;[3a] on October 28 the defendant went to the bank and cashed a check drawn on his account in the amount of $1,000.

It is well settled that "To sustain a conviction for perjury the evidence must be strong, clear, convincing and direct." United States v. Neff, 3 Cir., 1954, 212 F.2d 297, 306, 307.

The government contends that its proof meets the requirement of this rule; that Kushmore's testimony and bank records establish that the $10,583.-04 check was not *cashed* but was merely *deposited* in the defendant's account.

The defendant contends to the contrary. The sum of his contention is that since prior to the deposit of the $10,-583.04 check, his actual bank balance was $1,514.12, when the bank gave him cash of $3,534.72 because of his simultaneous deposit of the School check, he "got cash for this check" as he had told the Grand Jury.

The following excerpts from Kushmore's testimony are illuminating with respect to the defendant's contention:

"Q. Would you explain to the Court and jury just what happened when Mr. Rose presented that $10,-000 check? Do you know from your own knowledge? A. Yes, I do. I mean Mr. Rose came over to my desk, sat down and told me he had this deposit that he wished to make in the account. The deposit was accepted, and he stated that he would like to withdraw a certain sum of cash. The check, which I had made out for $3,534.72, was then given to him for his signature and the cash was received from our—one of our paying tellers and the cash turned over to Mr. Rose at that time.

"Q. At the time that you gave Mr. Rose $3,534.72 had the larger check for $10,583.04 been cleared? A. No, it had not been."

* * * * * *

"Q. So that when Mr. Rose delivered or deposited or cashed this check for $10,583.04 he had on de-

**3.** The defendant also made a $1,000 loan from the bank on October 25, 1949, but that loan had no bearing on the transaction here involved, as is evidenced by this statement of Kushmore that "It (the loan) would have no bearing whatsoever on the fact here that a deposit was made of $10,000 and likewise a withdrawal of $3,500 was made against it." The notes of testimony made it clear that the witnesses often used round figures; the $10,000 referred to the $10,583.04 check which was deposited and the $3,500 referred to the $3,534.72 check which was cashed by the defendant.

**3a.** Kushmore testified that on October 25 defendant spoke to him of the certification of the $5,870.08 check to Peerless Wallpaper and Paint Co.

"Q. Do you recall on October 25, 1949 when Mr. Rose made the deposit of the $10,000 check and withdrew $3,500—do you recall if on that date he told you he desired a certified check? A. If I remember correctly, I believe the question of certification came up at that time and Mr. Rose was told that on October 28 if we—if the funds were available, then we would certify a check as of that date.

"Q. And did you so certify such a check three days later? A. That is correct."

posit on October 25 a total balance of $1,514.12? A. That is correct.

"Q. Were any moneys paid to Mr. Rose when he presented this check in the amount of $10,583.04? A. There was $3,534.72 which was cashed the same day practically simultaneously there at the time the $10,583.04 check was deposited. In other words, we received the deposit first; then we paid out $3,534.72 in cash.

"Q. So that the check was cashed for $3,500? A. $3,534.72."

\* \* \* \*

"Q. *Was that check (for $3,534.-72) drawn against the funds of the $10,583.04 deposit? A. Yes, that would have been drawn against the deposit of $10,583.04.*

"Q. *As well as the $5,000 ($5,870.00) certified check at a later date? A. That is correct.*"

\* \* \* \* \* \*

"Q. Mr. Kushmore, directing your attention to the date of October 28, 1949, and 'Government's Exhibit No. 8' in evidence, will you kindly examine 'Government's Exhibit No. 8' in evidence and tell me whether or not there was a withdrawal of $1,000 from Maurice Rose's account on that day? A. Yes, sir. On October 28th there was a withdrawal of $1,-000 on the account.

\* \* \* \* \* \*

"Q. *Now, Mr. Kushmore, as I understand your testimony, there was a certified check which was dated October 25, 1949, and was certified on October 28, 1949, and that was in the sum of $5,870.08; that on—there was a check on October 25, 1949, in the sum of $3,534.72 drawn against that account; is that right? A. That is correct.*

"Q. *And there was a check or item of $1,000 on October 28, 1949,* for which you have no microfilm that was drawn against that account? A. That is correct.

"Q. Now the total of those three checks is $10,404.80. Do you wish to do your own computation? A. That would be correct.

"Q. Now on October 25th the check which is in evidence, 'Government's Exhibit No. 4' in the sum of $10,583.04—now, *were there sufficient funds in Mr. Rose's account from October 25th through October 28th to meet the total of the three checks of $10,404.80 without drawing on the proceeds of the $10,-538.04? A. No, there would not have been without taking into consideration the deposit of $10,-583.04." (Emphasis supplied.)

Kushmore's testimony as to the defendant's deposit of the $10,583.04 School check and his simultaneous cashing of his own $3,534.72 check against the deposit was corroborated by the bank's records. The same is true with respect to the certification of the defendant's $5,870.08 check following the bank's collection of the school check and the defendant's withdrawal of $1,000. The bank's records also established that at the time the defendant deposited the School check and drew $3,534.72 against it he only had a $1,514.12 balance in his checking account.

■ In considering the testimony adduced as to Count 1, we must take cognizance not only of the rule earlier stated that to sustain a conviction the evidence "must be strong, clear, convincing and direct" but must look also to these well-settled principles:

■ To sustain a conviction for perjury the burden is upon the government to establish by substantial evidence, excluding every other hypothesis than that of guilt, the essential elements of the crime charged.

■■ Perjury is the willful, knowing and corrupt giving, under oath, of false testimony material to the issue or point of inquiry. An essential element is that the defendant must have acted with a criminal intent—he must have believed that what he swore to was false and he

must have had the intent to deceive. If there was a lack of consciousness of the nature of the statement made or it was inadvertently made or there was a mistake of the import, there was no corrupt motive.[4]

Applying the principles stated we are of the opinion that the evidence adduced by the government as to Count 1 was insufficient to sustain the defendant's conviction.

The government's evidence failed to establish that the defendant had knowingly, willfully and corruptly made a false statement with respect to the mooted check transaction; more particularly that when he stated he had "got cash for this check" he knew such a statement was false and that he had the intent to deceive the Grand Jury.

It is clear from the testimony that the defendant "got cash for this check" inasmuch as he was permitted by his bank to withdraw $3,534.72 upon his deposit of the $10,583.04 check although his existing balance was only $1,514.12. No other conclusion is possible in view of Kushmore's statement that the $3,534.72 was "drawn against the deposit of $10,-583.04."

Furthermore, the government's testimony established that the certified check for $5,870.08 and the $1,000.00 check for cash were drawn against the proceeds of the $10,583.04 check; that the total of these withdrawals and the earlier $3,534.72 check was $10,404.80—an amount only slightly less than the deposited check.

While it is true that there was not a technical "cashing" of the School check that alone was not sufficient to establish that the defendant had perjured himself when he stated that he "got cash for this check" under the circumstances of this case.

■ Assuming that the defendant made a false statement when he stated that he "got cash for this check", it is settled that a false statement which is the result of an honest mistake is not perjury.[5] People are prone to use colloquial terms in describing events and in doing so err in failing to adhere to technical terms but such error is insufficient to establish perjury. At most the defendant's statement was equivocal.[6] In this essential regard the evidence falls far short of the well-settled requirement that the elements of the crime of perjury must be proved by clear and convincing testimony to a moral certainty[7] and beyond all reasonable doubt.[8] Evidence which is merely probable is not enough.[9]

■ The government contends that "It may be inferred that the language used by Rose was an attempt to deceive the Grand Jury and to lead their investigation into a will o' the wisp chase after cash instead of the specific checks that were actually issued." That contention falls of its own weight inasmuch as the indictment itself discloses that the defendant told the Grand Jury that he got

4. Fotie v. United States, 8 Cir., 1943, 137 F.2d 831; Smith v. United States, 6 Cir., 1948, 169 F.2d 118; Maragon v. United States, 1950, 87 U.S.App.D.C. 349, 187 F.2d 79, certiorari denied 1951, 341 U.S. 932, 71 S.Ct. 804, 95 L.Ed. 1361.

5. Seymour v. United States, 8 Cir., 1935, 77 F.2d 577, 99 A.L.R. 880. See also United States v. Edwards, C.C.S.D.Ala. 1890, 43 F. 67; State v. Mercer, 1905, 101 Md. 535, 61 A. 220, 221; People ex rel. Hegeman v. Corrigan, 1909, 195 N.Y. 1, 87 N.E. 792, 796.

6. Language used by individuals must be considered in the light of their educational, intellectual and environmental background. It may fairly be assumed that the defendant was a man of rather limited literacy in view of the testimony by Kushmore that he assisted the defendant by writing out the deposit slip for the School check and also his check for the withdrawal made against that deposit.

7. Smith v. United States, supra, Note 4.

8. United States v. Marachowsky, 7 Cir., 1953, 201 F.2d 5, certiorari denied, 1953, 34ɔ U.S. 965, 73 S.Ct. 949, 97 L.Ed. 1384; United States v. Nessanbaum, 3 Cir., 1953, 205 F.2d 93.

9. Phair v. United States, 3 Cir., 1932, 60 F.2d 953.

the cash at the Northwestern National Bank.[10] Under those circumstances it can scarcely be said that the defendant tried to lead the Grand Jury and the government up a blind alley with respect to the School check when he said he "got cash for this check."

\* \* \* \* \* \*

As to Count 2, which charged that the defendant committed perjury when he testified before the Grand Jury that he used part of the proceeds of the School check to pay the Federal Wallpaper Company $1,500 in cash:

The testimony as to this Count, at the trial, was as follows:

Philip Cohen, who traded as the Federal Wallpaper Company, and was its sole proprietor, testified that he did not have any transaction with the defendant either in the amount of $1,500 or at a time contemporaneous with the School check incident in October, 1949. Cohen said he had but one transaction with the defendant, which was consummated between December 29, 1949, and January 4, 1950; that the sum involved was $557.00 (not $1,500); and that he was paid in cash.

At the very outset of his testimony Cohen was asked by government counsel "Would you like to have your records?"; he answered in the affirmative and from that time on testified from what he described as his "Invoice Book" (Government's Exhibit No. 18).[11]

The Invoice Book contained entries on three separate pages noting the defendant had paid Cohen $100 on December 29, 1949, $200 on December 30, 1949 and $277 on January 4, 1950. The three pages in the Invoice Book each contained a signature "Philip Cohen". There is a fair inference from the testimony that two of the signatures were written by Cohen and the third by either his wife

or son-in-law. Cohen testified that he kept his own books but that "My son-in-law and my wife take care sometimes." The record fails to disclose which, if any, of the entries was made by his wife or son-in-law, or which of the pages contained his name signed by his wife or son-in-law.

The government offered in evidence Cohen's Invoice Books and they were admitted. There was no further testimony offered with respect to the defendant's dealings with Cohen.

It is the government's contention that Cohen's oral testimony and his Invoice Books satisfy the requirements of the "two-witness rule" in perjury cases in that it corroborated his testimony.

The defendant contends to the contrary, urging (1) the "two-witness rule" has not been satisfied because Cohen's records were used to "refresh" his memory and therefore did not themselves constitute evidence; (2) Cohen's Invoice Books started with December 28, 1949, and did not reflect any of his business transactions prior to that date and therefore had no probative value since they could not under those circumstances be used to establish a "negative" (that the defendant had not paid Cohen $1,500 in cash at an earlier date as he had testified before the Grand Jury), and (3) Cohen's books were not independent corroboration, because, except for possibly one step in his dealings with the defendant, it was a record kept by Cohen himself.

▬▬▬ With respect to the "two-witness rule" these principles are well-settled, as we recently noted in United States v. Neff, supra, 212 F.2d at page 306:

"In prosecutions for perjury the uncorroborated oath of one witness is not enough to establish the falsity

---

10. "Q. Where did you get the cash? A. At the Bank.

"Q. What Bank? A. At the Northwestern National.

"Q. Are you sure? A. Yes sir."

11. "Q. Will you tell us, Mr. Cohen, ac-

cording to your records what transaction you had with Maurice Rose, when, what you sold him, any conversation you had with him in regard to that? Tell us in your own way.

"A. According to this record, on 12–29–49. \* \* \*"

of the testimony of the defendant; the falsity must be evidenced by the testimony of two independent witnesses or by one witness and corroborating evidence, and in the absence of such proof the defendant must be acquitted. * * * Where the government seeks to establish perjury by the testimony of one witness and corroborating evidence, the latter must be independent of the former and inconsistent with the innocence of the defendant. 'When the courts speak of corroborative evidence they mean *evidence aliunde* —evidence which tends to show the perjury independently.' Before submitting a perjury case to the jury the court must determine whether the quantitative rule of evidence has been satisfied."

▮▮▮▮ It is unnecessary for us to concern ourselves with defendant's second and third points [12] because we are in accord with his first point that Cohen's records were not admissible because they had been used from the very beginning of his testimony to "refresh" his memory. As we stated in United States v. Riccardi, 3 Cir., 1949, 174 F.2d 883, 888, certiorari denied, 1949, 337 U.S. 941, 69 S.Ct. 1519, 93 L.Ed. 1746 " 'When a party uses an earlier statement of his own witness to refresh the witness' memory, the only evidence recognized as such is the testimony so refreshed.' " Observation to this effect was made in United States v. Seavey, 3 Cir., 1950, 180 F.2d

837, 840; 339 U.S. 979, 70 S.Ct. 1023, 94 L.Ed. 1383.[13] Accordingly, it follows that since Cohen's records were not admissible and there remained as a consequence only his oral testimony on the score of the charged falsity of the defendant's statement as to his dealings with him there was a failure of compliance with the "two-witness" rule and an acquittal must be directed as to Count 2.

* * * * * *

As to Count 3, which charged that the defendant committed perjury when he testified before the Grand Jury that he used part of the proceeds of the School check to pay the Fidelity Paint Company $3,000 in cash:

The testimony as to this Count may be stated briefly. The Fidelity Paint Company was a partnership engaged in the manufacture of paints and varnishes, and in a wholesale and retail business. The partners were Daniel G. Hartman and John M. Urban. The latter testified as to his concern's dealings with the defendant. In doing so, from the very beginning of his testimony, he "refreshed" his memory from business records which he said he "kept".[14] The substance of Urban's testimony was that he had had various transactions with the defendant during the years 1938–1941, inclusive, but that he had no further dealings with him thereafter until December 19, 1949, at which time he sold him paint in the net amount of $1,200; he had another small transaction almost a year later, on November 18, 1950, and a third on No-

12. Cf. Shreve v. United States, 9 Cir., 1935, 77 F.2d 2, 6, 7, certiorari denied, 1935, 296 U.S. 654, 56 S.Ct. 380, 80 L.Ed. 466, which held that in a prosecution for using mails to defraud, corporate books which failed to show that corporation executed note held inadmissible for purpose of showing that the corporation executed no note.

13. " * * * writings used to refresh a witness' memory are not themselves evidence."

14. "Q. Who keeps the records, the business records, of Fidelity?
"A. I.
▮▮▮▮▮▮

"Who kept the records—who made up the records which the Government introduced here. * * *
"A. I did.
"Q. You did. I show you 'Government's Exhibit No. 19 * * * which is a statement addressed to Mr. Rose in the amount of $1,213.75 less a discount of $13.75 or a net bill of $1,200.00. Will you tell the jury whether or not you made up that statement?
"A. Yes, I did.
"Q. That is in your handwriting?
"A. That is in my handwriting."
Similar testimony was given by Urban with respect to each of the six records about which he testified.

vember 24, 1950, in the amount of $971. He said that with respect to each of these transactions he was paid by check. He denied that he had received $3,000 in cash from the defendant in 1949, or thereafter (particularly on or about October, 1949), or that he had had any transactions with him in that amount at that time.

The government offered in evidence three separate invoices covering the transactions on December 19, 1949, and in November, 1950, which Urban said he had personally written out at the time they were consummated. It also offered in evidence three deposit slips which he said related to the checks which he had received from the defendant in December, 1949, and November, 1950. The slips, Urban said, were his own written copies of the deposit slips he made out at the time of the deposits. They were not receipted by his bank. Urban said the transactions represented by the invoices offered in evidence were recorded on the books of his concern. The books of the latter were not, however, offered in evidence nor was there any explanation made with respect to that circumstance.

There was no further testimony offered by the government with respect to Urban's dealings, or lack of them, with the defendant in 1949 or his dealings with him in 1950.

The government contends that Urban's oral testimony was corroborated by his invoices and duplicate deposit slips, admitted in evidence, and that its proof meets the requirements of the "two-witness" rule.

The defendant contends (1) Urban's invoices and deposit slip duplicates were inadmissible as evidence because they were used to "refresh" his memory and (2) Urban's invoices and deposit slips were not independent corroboration because they were in his own handwriting and had been prepared by him.

We subscribe to the defendant's contention as to his first point for the reason stated with respect to his similar point in our discussion of Count 2. As to his second point, it is well-settled that the " * * * corroboration of the testimony of a single witness should be such that it supplies *independent* proof of facts inconsistent with the innocence of the accused."[15] Here the records kept by Urban himself were not independent proof of circumstances tantamount to that of another witness' testimony and accordingly did not achieve the required status of corroborating evidence. Since there remained only Urban's testimony as to his dealings with the defendant there was a failure to comply with the requirements of the "two-witness" rule and accordingly an acquittal must be directed as to Count 3.

\* \* \* \* \* \*

As to Count 4, which charged that the defendant perjured himself when he told the Grand Jury that he had placed part of the proceeds of the School check in a drawer in his bedroom:

The government did not offer a single scintilla of evidence to establish that the defendant had not placed any of the proceeds of the School check in a drawer in his bedroom, despite the specific averment in Count 4 that "the defendant did not place any part of the proceeds of said check * * * in a drawer in the bedroom of his home."

It takes the position (in its brief) that since the defendant did not "cash" the School check "then it must follow as a legal and logical conclusion that there were no cash proceeds of the $10,583.04 check * * * to deposit in a bureau drawer, as he testified before the Grand Jury."

We need not explore the government's ingenious contention in view of the averment as to the defendant's perjury in Count 4. As earlier noted the averment

---

15. United States v. Hiss, 2 Cir., 1950, 185 F.2d 822, 824, certiorari denied, 1951, 340 U.S. 948, 71 S.Ct. 532, 95 L.Ed. 683; see also McWhorter v. United States, 5 Cir., 1952, 193 F.2d 982, 985; United States v. Neff, 3 Cir., 1954, 212 F.2d 297.

is that "the defendant did not place any part of the *proceeds of said check* \* \* in a drawer in his bedroom". (Emphasis supplied.) Even assuming that the defendant had failed to "cash" the School check the government's own evidence established that he received $3,534.72 cash against *"the proceeds of the (School) check"* and Count 4 deals with "any part of the proceeds" of the check. Since there were "proceeds of the said check" and the government charged that the defendant had perjured himself with respect to his placing "any part of the proceeds" in his bedroom drawer it could not convict him except by the production of the required evidence that he had not in fact acted as he had told the Grand Jury.

Since the government failed to present the evidence required of it an acquittal must be directed as to Count 4.

\* \* \* \* \* \*

As to Count 5, which charged that the defendant perjured himself when he testified before the Grand Jury that he did not have a safe deposit box:

The defendant's testimony before the Grand Jury on this phase of the case reads as follows:

"Q. Have you got a safe deposit box? A. No sir."

The testimony as to this Count, at the trial, was as follows:

Mrs. Margaret King, who was custodian of the safe deposit records at the Northwestern National Bank, produced two sets of records. The first set consisted of *rental* cards for a joint safe deposit box in three names—the defendant, his wife and daughter; the second of three *entrance* cards which contained the signatures of the defendant and his wife opposite various listed dates when they had access to their safe deposit box. The rental for the safe deposit box was charged against the joint bank account of the defendant and his wife. The box was first rented by the defendant on February 19, 1945, in his own name; subsequently, on October 21, 1946, the defendant and his wife were listed as lessees

of the box. Their lease terminated on February 19, 1952. The entrance cards showed entry to the box on 38 occasions by the defendant extending from September 24, 1945, to January 25, 1952. (The defendant's testimony as to his non-possession of a safe deposit box was given to the Grand Jury on December 19, 1951, according to Count 5.)

It is the defendant's contention that the government's evidence as to the safe deposit box did not prove that his testimony before the Grand Jury was false; that, on the contrary, it proved its truth. He premises this contention on the theory that the defendant's interest in the box was in the nature of a tenancy by entireties (with his wife and daughter) and that consequently the defendant did not actually have the box.

The government contends to the contrary. In doing so it says that its evidence established the defendant's ownership of the box. It may be noted parenthetically that in its brief the government asserts that Mrs. King "testified as to her own personal knowledge that Rose had a safe deposit box \* \* \*" and that the bank's records supplied the necessary corroborative evidence. The notes of testimony however, fail to disclose any testimony by Mrs. King of "personal knowledge" that the defendant had a safe deposit box. On the other hand it shows clearly that her testimony was based entirely on the bank's records of which she was custodian.

In our opinion, however, it is immaterial that Mrs. King did not testify as to her "personal knowledge". The bank's records were competent evidence and the government sustained its burden of proof by their presentation.

We do not agree with the defendant's novel argument that the bank's records so clearly established the truth of the defendant's testimony before the Grand Jury, as to require an acquittal here.

On the other hand, we are of the opinion that it was for the jury to determine whether or not the government's evidence established that the defendant had willfully intended to deceive the Grand

Jury on the issue as to whether he did or did not have a safe deposit box.

■ The requirements of the "two-witness" rule were met when the government introduced the two sets of records relating to the rental and use of the safe deposit box even though there was an absence of a living witness as to the situation.

■ As we stated in Phair v. United States, 3 Cir., 1932, 60 F.2d 953, 954: "A living witness is no longer necessary to a conviction for perjury where the defendant's own acts, business transactions, documents, or correspondence show that his oath charged to be perjury is false." Earlier, in Hammer v. United States, 1926, 271 U.S. 620, 627, 46 S.Ct. 603, 604, 70 L.Ed. 1118, it was said: "Undoubtedly in some cases documents emanating from the accused and the attending circumstances may constitute better evidence of such falsity [of the matter alleged as perjury] than any amount of oral testimony." See also United States v. Nessanbaum, 3 Cir., 1953, 205 F.2d 93 and United States v. Palese, 3 Cir., 1943, 133 F.2d 600, 602. In the latter case we said: "It has also been held that the production of documentary or written testimony springing from the defendant himself may take the place of a living witness. * * * But the necessity for some corroboration has never been eliminated." [16]

Here the *entrance* cards, signed by the defendant, constituted "written testimony springing from the witness himself" that he had an interest in, and access to a safe deposit box. The bank's *rental* records showing a tenancy interest in a safe deposit box were, of course, competent evidence.

■ From these independent sets of evidence the jury could properly find that the defendant, in testifying before the Grand Jury as he did, swore falsely with an intent to deceive.

\* \* \* \* \* \*

As to defendant's contention that the trial judge erred in denying his request to inspect the transcript of all his testimony before the Grand Jury:

Prior to the trial the defendant filed a "Motion to Inspect Minutes of Grand Jury", averring that he was suffering from diabetes and a heart ailment at the time he testified before the Grand Jury; that as a result he suffered lapses of memory; that the testimony offered by him before the Grand Jury was so voluminous that he could not remember all of it; that all of his testimony before the Grand Jury on matters relevant and pertinent to the charge in the indictment had not been set forth therein; that the statements, averments and explanations accompanying the testimony involved in the indictment would give that testimony a meaning different from that charged in the indictment, and would negate perjury; and that defense counsel could not intelligently proceed to the defense of the action until they were fully apprised of defendant's testimony before the Grand Jury. This motion was denied and the case proceeded to trial.

Two similar motions made during the course of the trial were likewise denied.

■ Grand Jury proceedings are traditionally secret.

In United States v. Amazon Industrial Chemical Corp., D.C.Md.1931, 55 F.2d 254, 261, the reasons generally given for this rule of secrecy were summarized as follows: (1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investiga-

---

16.   See also Barker v. United States, 9 Cir., 1952, 198 F.2d 932.

tion, and from the expense of standing trial where there was no probability of guilt.[17]

As was to be expected, however, an exception to the rule developed when its strict application would defeat the ends of justice.

In United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 234, 60 S.Ct. 811, 849, 84 L.Ed. 1129, the Supreme Court, after stating "Grand jury testimony is ordinarily confidential" declared "But after the grand jury's functions are ended, disclosure is wholly proper where the ends of justice require it." [18]

Rule 6(e) of the new Federal Rules of Criminal Procedure provides for disclosure of matters occurring before the grand jury " * * * when so directed by the court preliminarily to or in connection with a judicial proceeding * * *." [19]

In United States v. Remington, 2 Cir., 1951, 191 F.2d 246, 250, certiorari denied, 1952, 343 U.S. 907, 72 S.Ct. 580, 96 L.Ed. 1325, the Court of Appeals for the Second Circuit was faced with the same issue which is raised here. The defendant had been found guilty of the crime of perjury in testifying before a grand jury that he had never been a member of the Communist Party. The Court of Appeals reversed, and said:

"The court denied the defendant's motion to inspect the minutes of his own testimony before the grand jury. We think inspection before trial should have been allowed. As already stated, the essential issue in perjury is whether the accused's oath truly spoke his belief; all else is contributory to that issue. In deciding it the jury was entitled to know, and the accused was entitled to show, what had gone before the critical question and answer, since this might throw light on how he understood the question and what he meant by his answer. For example, if he had previously testified that he never had a Party card, that might indicate that he believed that without a card he could not be a member. His memory of what he said is no adequate substitute for the minutes themselves. It is one thing to deny the defense access to grand jury minutes which it intends to use for the relatively negative purpose of impeaching a witness; it is quite a different thing to deny an accused access to the minutes of his own testimony which may afford him an affirmative defense. * * * We see no good reason for suppressing the evidence under these circumstances." [20]

We think that United States v. Remington enunciates a sound principle of law insofar as perjury cases are concerned, and accordingly conclude that the trial judge erred when he denied the defendant's motions to inspect his testimony before the Grand Jury.

When placed in their full setting defendant's statements to the Grand Jury might well take on different connotations

17. See also, In re Attorney General of the United States, 1936, 160 Misc. 533, 534, 291 N.Y.Supp. 5, 7.

18. To the same effect, Metzler v. United States, 9 Cir., 1933, 64 F.2d 203, 206, which held: "After the indictment has been found and made public and the defendants apprehended, the policy of the law does not require the same secrecy as before. * * * Where the ends of justice can be furthered thereby and when the reasons for secrecy no longer exist, the policy of the law requires that the veil of secrecy be raised." Likewise in United States v. Byoir, 5 Cir., 1945, 147 F.2d 336, 337, it was stated " * * * the judge had discretionary authority to permit disclosure of what happened before the grand jury when necessary to advance the cause of justice. * * * " See also United States v. Alper, 2 Cir., 1946, 156 F.2d 222, 226.

19. 18 U.S.C.A. Rule 6(e).

20. Cited with approval and followed in United States v. White, D.C.N.J.1952, 104 F.Supp. 120. See also, People v. Kresel, 1931, 142 Misc. 88, 254 N.Y.S. 193.

than when viewed in relative isolation.[21] Furthermore, the rationale of the Remington case is especially applicable, when, as here, the defendant asserted that lapses of memory attributed to his physical condition made it difficult to recall his Grand Jury testimony for the purpose of preparing his defense.

Since all the defendant desires is a transcript of his *own* testimony, the sanctity of that which transpired before the Grand Jury is hardly in question. In addition, such disclosure would not subvert any of the reasons traditionally given for the inviolability of Grand Jury proceedings.

\* \* \* \* \* \*

In view of our disposition with respect to Count 2, it is unnecessary to discuss the defendant's contention that the trial judge erred in denying his 9th point for charge which related to that Count. His contention with respect to the denial of his 14th point for charge relating to the "two-witness" rule has been covered in our earlier discussion of that rule.

One final comment.

 In sentencing the defendant the trial judge imposed a "lump" sentence on the 5-count indictment instead of dealing with each count separately. While there exist divergent views on the subject of such form of sentencing we are strongly of the opinion that it is highly desirable that the trial judge in imposing sentence on an indictment containing more than one count deal separately with each count. It may be pointed out that in Chmielewski v. United States, 6 Cir., 1946, 158 F.2d 800, the Court remanded

---

21. See Fotie v. United States, 8 Cir., 1943, 137 F.2d 831, 842. "A charge of perjury may not be sustained by the device of lifting a statement of the accused out of its immediate context and thus giving it a meaning wholly different from that which its context clearly shows."

22. In United States v. Karavias, 7 Cir., 1948, 170 F.2d 968, 971, the Court expressed the view that " \* \* \* it is the better practice in imposing sentence upon multiple counts of a criminal indictment

---

to the District Court with directions to set aside a general sentence and to resentence specifically on each count.[22]

For the reasons stated the judgments of conviction will be reversed as to Counts 1, 2, 3, 4 and 5, and the cause remanded to the District Court with directions to enter judgments of acquittal with respect to Counts 1, 2, 3 and 4, and that a new trial be had as to Count 5.

to specify the term of imprisonment as to each count, rather than to impose a general sentence \* \* \*." although it held that a general sentence was "not of sufficient importance to require the case to be remanded to the district court. for resentencing."

In Levine v. Hudspeth, 10 Cir., 1942,. 127 F.2d 982, the Court pointed out that it was the "better practice" to deal with each count separately.