**David M. DiFOLCO, et al.**

v.

**Dennis J. ROBERTS, II, et al.**

**Civ. A. No. 82–0667 P.**

United States District Court, D. Rhode Island.

March 14, 1984.

Joseph E. Penza, Jr., Kevin J. McAllister, Providence, R.I., for plaintiffs.

Gerard McG. DeCelles, City Sol., Providence, R.I., for defendants.

William Walsh, Asst. Atty. Gen., Providence, R.I., for the State of R.I.

## MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

The plaintiffs in this action are two City of Providence police officers who were the focus of a grand jury inquiry in September 1982. Although no indictments were returned against the officers, the grand jury did prepare a report which recommended that the plaintiffs be fired. As a result, the plaintiffs sued Dennis J. Roberts II, the Attorney General of Rhode Island, Maureen McKenna Goldberg, a state Assistant Attorney General, and Colonel Anthony J. Mancuso, the Chief of Police of the City of Providence, under 42 U.S.C. § 1983 and 28 U.S.C. § 2201 *et seq.*, the Declaratory Judgment Act. Defendants Roberts and McKenna Goldberg have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

The plaintiffs' complaint alleges that on or about September 15, 1982, the Grand Jury of Providence and Bristol Counties issued a written report concerning the plaintiffs. The report allegedly recommended that the plaintiffs be removed from their jobs because of their actions on the

night of July 25, 1982.[1]  No criminal indictments were issued against either of the plaintiffs.

The plaintiffs contend that the grand jury's "preparation and issuance of [the] report was accomplished with the guidance and direction" of defendants Roberts and McKenna Goldberg, and that the issuance of the report was unauthorized and unlawful.  They further allege that Roberts and McKenna Goldberg "orchestrated" the dissemination of the report to persons outside the scope of Rule 6(e) of the Rhode Island Rules of Criminal Procedure.[2]  The persons to whom the report was released allegedly included defendant Mancuso and the Providence Journal Bulletin newspaper.  They claim that this violated the Rhode Island Rules of Criminal Procedure, the grand jurors' oaths, and the plaintiffs' rights under the fifth and fourteenth amendments to the United States Constitution and article forty of the Rhode Island Constitution, which governs grand juries and indictments.

Finally, the plaintiffs allege that as a result of receiving the report and because of some sort of collaboration with Roberts and McKenna Goldberg, defendant Mancuso issued departmental charges and specifications against the plaintiffs.  These charges and specifications allegedly may result in the plaintiffs losing their jobs.  The plaintiffs contend that this alleged cooperation between the prosecutors and the police constitutes a violation of the federal constitutional Doctrine of Separation of Powers because "an agency of the executive branch [the Providence Police Department,] is utilizing an arm of the judicial branch [, the grand jury] for its own internal administrative purposes," thereby abridging their fourteenth amendment due process rights.  Moreover, the plaintiffs argue that this procedure violates their protection against being held to answer for "any criminal offense unless on presentment or indictment under the fifth amendment to the United States Constitution and article forty of the Rhode Island Constitution.

The plaintiffs request several forms of declaratory, monetary, and injunctive relief.

## I.  ABSOLUTE IMMUNITY

The defendants contend that they are entitled to absolute prosecutorial immunity for their actions.  In *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the Supreme Court held that when prosecutors are engaged "within the scope of [their] duties in initiating and pursuing a criminal prosecution," they are absolutely immune from damages under § 1983.  *Id.* at 410, 96 S.Ct. at 985.  The scope of duties to which *Imbler* granted absolute immunity is very narrow:  "We hold only that in initiating a prosecution and in presenting

1. Neither the Complaint nor the Answer alleges what those actions were.

2. Rule 6(e) of the Rhode Island Rules of Criminal Procedure is similar to Rule 6(e) of the Federal Rules of Criminal Procedure.  It states:
   Secrecy of Proceedings and Disclosure.  A stenographic or other record shall be made of all proceedings before the grand jury other than its deliberations and voting.  Disclosure of matters occurring before the grand jury, other than its deliberations or the vote of any juror where an indictment has not been returned, may be made to attorneys for the State for use in the performance of their duties.  Otherwise, a juror, attorney, interpreter, stenographer, operator of a recording device, or any typist who transcribes recorded testimony may disclose matters occurring before the grand jury only when so directed by the court preliminary to or in connection with

a judicial proceeding or when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury.  No obligation of secrecy may be imposed upon any person except in accordance with this rule.  In the event an indictment is not returned any notes of a stenographer and transcriptions of such notes, and any other recordings of the proceedings, shall be delivered to and impounded by the court.  The court may direct that an indictment shall be kept secret until the defendant is in custody or has given bail, and in that event the court shall hold the indictment and no person shall disclose the finding of the indictment except when necessary for the issuance and execution of a warrant or summons.

the state's case, the prosecutor is immune from a civil suit for damages under § 1983." *Id.* at 431, 96 S.Ct. at 995.

Although the presentation of evidence to a grand jury in hopes of securing an indictment clearly falls within the scope of "initiating a prosecution," other sorts of activities, such as those at issue here, must be examined closely to determine whether they merit the grant of absolute immunity. *See Gray v. Bell,* 712 F.2d 490, 500–01 (D.C.Cir.1983). In *Gray,* the United States Court of Appeals for the District of Columbia Circuit recently described the factors which merit granting prosecutors an absolute, rather than merely a qualified, immunity for activities within their "prosecutorial" function:

> First, it has been noted that a prosecutor is especially vulnerable to retaliatory litigation. A prosecutor almost daily brings to bear the enormous power of the state against individuals; the weight of that power and the general opprobrium of the criminal sanction combine to create a unique potential for vengeful countersuits. Absolute immunity is thus justified "by the concern that [prosecutors] ...—required by law to make important decisions regarding the initiation, conduct, and merit of controversies which often excite 'the deepest feelings' of the parties—would be intimidated in the exercise of their discretion by the fear of retaliatory lawsuits brought by angry defendants." *Marrero v. City of Hialeah,* 625 F.2d 499, 507 (5th Cir.1980), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 2d 337 (1981).
>
> Second, it has been recognized that built-in safeguards diminish the need for private redress against prosecutorial abuse. Inherent in the judicial process are checks that serve to restrain prosecutorial abuse, and any abuse that does occur

is subject to various self-remedying mechanisms of the adversarial process. 712 F.2d at 497–98 (footnotes omitted).

A prosecutor is, ideally, the servant of the grand jury. If the grand jurors have the legal authority to issue a report such as the one in question, and the prosecutor did not have absolute immunity from liability for his actions in connection with it, the prosecutor would be placed in the unacceptable position of choosing between dereliction of his duty to assist them and civil liability for the report, a dilemma similar to that which he would face in initiating a prosecution if absolute immunity did not exist. However, if the grand jury has no authority to issue such a report, the prosecutor would not be faced with this quandary. If over his objections the grand jurors were to issue a report, he could refuse to assist them with it. Therefore, before applying the other considerations in favor of absolute immunity to this case, the Court will first examine the question of whether a state grand jury in Rhode Island has the authority to issue a report such as the one in question.

Article forty of the Rhode Island constitution states, in relevant part, that

> no person shall be held to answer for any offense which is punishable by death or by imprisonment for life unless on presentment or indictment by a grand jury, and no person shall be held to answer for any other felony unless on presentment or indictment by a grand jury or on information in writing signed by the attorney general or one of his designated assistants ....

The provision ends with the statement that "[n]othing contained in this article shall be construed as in anywise impairing the inherent common law powers of the grand jury."

Even before the insertion of article forty into the state constitution in 1973,[3] the

---

**3.** The former provision of the state constitution on grand juries stated

> No person shall be held to answer for a capital or other infamous crime, unless on presentment or indictment by a grand jury, except in cases of impeachment, or of such

offenses as are cognizable by a justice of the peace, or in cases arising in the land or naval forces, or in the militia when in actual service in time of war or public danger. No person shall, after an acquittal, be tried for the same offense.

Rhode Island Supreme Court had ruled that the powers of a Rhode Island grand jury corresponded to those of a grand jury at common law. *In re Opinion to the Governor*, 62 R.I. 200, 205, 4 A.2d 487, 489 (1939). Since no statute, constitutional provision, or decision by the Rhode Island Supreme Court states whether a Rhode Island grand jury has the power to issue a report such as the one in question in this case, we must look to whether common law grand juries had any power to issue reports such as the one in question.[4]

The role of the grand jury was well known throughout the English world in the seventeenth and eighteenth centuries, and it has changed little to the present day. As Henry Care wrote,

> the end of [the grand juror's] Office is ... two-fold. 1. To inquire after, and give Notice of all Crimes, Offences, Nuisances, &c. in the County for which they serve, which by reason of their Inhabitancy and Estates therein, they are presumed to have best Opportunity to discover, and to find Bills against Malefactors, where there are good Grounds for the same, that they may be brought to Trial if they are forthcoming, or may be proceeded against to the Outlawry, if

they are fled for their said Offences. 2. To preserve the Innocent from the Disgrace and Hazards which ill Men may design to bring them to, out of Malice, or through Subornation, or other sinister Ends; for so tender is the Law, of the Reputation and Life of a Man, that it will not suffer the one to be sullied, by the Party's holding up his Hand at the Bar, and the other indangered by a Trial, until first the Matter and Evidence against him have been scann'd, examined, and found by a Grand Jury, upon their Oaths, against him. Therefore you see by their Oaths, that they are sworn not only to inquire, but *diligently* to inquire, not to be negligent or slothful, nor take things upon Trust, or hurry them over carelessly, but to weigh the Circumstances, and sift the Witnesses, and search out the Truth of such Informations as come before them; and to reject the Indictment, if it be not sufficiently proved; ....

H. Care, English Liberties, or the Freeborn Subject's Inheritance 207 (additions by W. Nelson; Boston 1721) (emphasis in original).

The grand jury seems also to have had some limited powers over roads and

R.I.Const. art. 1, § 7 (annulled by R.I.Const. art. XL, § 2, which was adopted November 6, 1973).

4. Grand juries generally exist to conduct a preliminary investigation into the merits of charges that individuals have engaged in criminal activity. Grand juries return charges against individuals in two forms: indictments and presentments. The distinction between these two forms has not changed since colonial times. Indictments are charges laid before the grand jury by the prosecutor. H. Care, English Liberties, or the Freeborn Subject's Inheritance 206 (additions by W. Nelson; Boston 1721). Presentments, however, arise

> when the Jury themselves, of their own Knowledge or Inquiry, do take Notice of some Crime, Offence or Nuisance, to the Injury of the Publick, which they think fit should be punished or removed; and in order thereunto, do give the Court notice thereof in Writing briefly and without Form, only the Nature of the Thing and the Persons Name and the Place.

*Id.* (by "Nusance," the author is referring to indictable criminal nuisances—*see id.* at 207).

When the grand jury decides that sufficient evidence exists to charge a person with the crime specified in an indictment, it endorses the indictment with the words "true bill" or "*bills vera.*" If the jurors should determine that there is insufficient evidence to return a true bill, they endorse the indictment with the words "no true bill" or "ignoramus." Reports of the kind at issue in this case are sometimes referred to as "presentments." *See, e.g., In re Presentment by Camden County Grand Jury*, 10 N.J. 23, 89 A.2d 416, 423 (1952). This Court, however, will use the word report to distinguish this sort of document from traditional criminal presentments. The institution of the grand jury has existed in Rhode Island since its earliest days. In a 1647 statute, the colonial assembly established grand juries, or "grand inquests," in Rhode Island: "To save needless expenses and travailes, be it enacted, by the authority of this present Assemblie, that all Traitors, Felons, and such as are suspected thereof shall be indicted by twelve or sixteen honest and lawful men ...." 1 Records of the Colony of Rhode Island and Providence Plantations in New England 198 (Providence 1856).

bridges: "Justices in Sessions, upon Presentment made by the Grand Jury, that a Bridge is in Decay, and 'tis not known who shall repair it, may assess the whole County in proportion, as hath been usually assessed." *Id.* at 248. This power may well have been statutory, as the power over bridges was by 1793 in Pennsylvania:

> Besides [the grand jury's] duty, respecting criminal law, an act of assembly gives authority to the grand jury, to concur with the county court and commissioners, in directing the building of bridges within the county; and with them and the grand jury, court, and commissioners, of any adjacent county, in directing the building of bridges on a stream dividing the two counties.

A. Addison, No. VIII, Observations on the Duty of a Grand Jury, Charges to Grand Juries of the Counties of the Fifth Circuit in the State of Pennsylvania, Addison's Reports 71, 75 (1800) (charge given in 1793) (the jury charges are in the separately paginated second half of Addison's Reports—the part of that work will hereinafter be cited as Grand Jury Charges, Addison's Reports).

Although such presentments would appear to be noncriminal and merely expressions of public will, this Court notes that as late as 1889 township supervisors were indicted and tried in Pennsylvania for the statutory public nuisance of failing to repair a highway. *Commonwealth v. Bradney*, 17 A. 600, 126 Pa. 199 (1889).

Finally, there appears to have existed the practice of grand juries issuing reports or presentments of public grievances or opinion during the colonial period. In England, the members of the grand jury issued " 'frequent presentments at the Assizes and Quarter Sessions ... drawing attention to grievances.' " G.H. Dession & I.H. Cohen, The Inquisitorial Functions of Grand Juries, 41 Yale L.J. 687, 706 (1932) (quoting S. Webb & B. Webb, English Local Government from the Revolution to the Municipal Corporations Act: The Parish and the County 455 (1906)). In colonial Virginia, " '[i]t appears to have been a common practice for grand juries gathered at the capitol

to express their opinions on things in general, and on the administration of the royal governor in particular.' " Dession & Cohen, *supra*, at 706 (quoting Scott, Criminal Law in Colonial Virginia 70 (1930)). Similarly, the Philadelphia grand jury issued these presentments in 1686:

> "Wee doe present as an aggrievance ye gate which stoppeth the high way upon ye bridge by ye Govrs mill, it being both troublesome and dangerous
>
> "Wee doe also present the burning of lime both in & upon the banke in the towne as being both noisome & dangerous for fyreing houses. Wee doe present James Claypoole Justice of ye peace of Philadelphia for endeavoring by an indirect way to prepossess Judge More in a Case yt was to be tryed before him in the provinciall Court, being by us llikt upon to be of a dangerous Consequence. Also, when Patrick Robinson was to administer upon the estate of benj. Ecorod, for giving ill Counsell and assuming more power to himselfe yn ye law alloweth of, And for menacing and abusing ye jurors in the triall of John Moon which was an Infringement of ye rights and properties of ye people.
>
> "Wee doe further present as an aggrievance yt the former presentments were not presented according to law[.]"

S.W.Pennypacker, Pennsylvania Colonial Cases: The administration of Law in Pennsylvania prior to A.D. 1700 as shown in the cases decided and in the Court proceedings 116–17 (1892).

Although the practice undoubtedly existed, it was not a part of the grand jurors' recognized quasi-judicial authority. "In making these reports the jurors were understood to act not as the representatives, but rather as a respectable collection of the people of the county. It was a practice founded on no law." Dession & Cohen, *supra*, at 706. A 1793 grand jury charge of one Pennsylvania judge reviews the practice:

> A kind of censorial authority is sometimes exercised by the grand jury.

Viewing themselves not as the representatives, but as a respectable collection, of the people of the county, they consider it proper to express, in a public manner, their united sentiments of public inconveniences, improvements, or other transactions, measures, or things, of a general nature, and affecting the welfare of the county, or on which it is proper for their voice to be known; express praise or blame, according to their nature or tendency; and suggest or recommend the prosecution of public benefits, and redress of public grievances. *In this, they act not in their official capacity nor is the exercise of this authority founded on any law.* This authority is founded only on use, and a presumed public convenience; and, when exercised discreetly [sic], it may be attended with good effects. The want of public buildings for instance, in this county, appears to me a great inconvenience, and well deserving the animadversion of the grand jury. The want of a gaol (for the present gaol is almost worse than none) renders the execution of criminal law a nuisance to the county.

"Observations on the Duty of a Grand Jury," Grand Jury Charges, Addison's Reports, *supra,* at 75–76 (emphasis added; footnote omitted).[5]

The Solicitor General of Massachusetts, writing in 1831, had a different opinion on the salutariness of the practice, although he agreed that it was not part of the authority conferred upon the grand jury by law:

The practice, not uncommon in some parts of the United States, of bringing forward in the form of presentments, what are denominated public grievances, relative to the political or moral state of the country, *is altogether extra-official,* and may be and has been adopted and pursued for, and purposes foreign to, and inconsistent with, the nature of the institution; and perhaps it is not too much to assert, that the opportunity has been used and perverted to party purposes, and with an intention to produce an effect upon public measures and the public mind. Whenever this shall be the case, *it is to be considered in the same light as any other usurpation or abuse of the judicial authority.* It may, with the same propriety, be exercised by any other branch of the judicial power; by the court, or the traverse jury, as well as the grand jury.

D. Davis, Precedents of Indictments; to which is prefixed A Concise Treatise upon the Office and Duty of Grand Jurors 11 (Boston 1831) (emphasis added).[6]

5. The use of the grand jury to express the views of the judge, which is implied here, is analogous to the improper use of grand jury in colonial Virginia, where
> "[i]t was an advantage ... for the [royal] Governor to have a group chosen who could be counted on to pass a laudatory resolution which he could modestly forward to the Board of Trade as an indicator of public opinion. Taking matters into his own hands, Governor Nicholson (1698–1705) sent outside the capital for a foreman, and gave orders to the sheriff as to choosing or excluding other persons."

Dession & Cohen, *supra,* at 706 (quoting Scott, Criminal Law in Colonial Virginia 70 (1930)). Judge Addison echoed his sentiments on the grand jury being limited in its actual lawful authority to criminal indictments and presentments in another charge given to a grand jury in 1793:
> You and we are now here, gentlemen, in the capacity of public officers, called, by the constitution and laws of our government to en-

quire, whether any, within this county, have violated the duty, which they owe to the state. *For our present authority, as public officers, extends only to offences against the laws of the state.* Such is the nature and extent of our duty.

"Laws and Sanctions of God, the State, and the Society. The Duty of Enforcing each of these laws, by the Sanctions of Society, Honour and Shame," Grand Jury Charges, Addison's Reports, *supra,* at 92.

6. This Court recognizes that other courts have found that grand juries had the authority to issue reports at common law. Their opinions are unpersuasive, however, because they are generally based solely on the fact that the practice actually existed in colonial times and not on the actual legal authority for, or status of, those reports. *See, e.g., In re Presentment by Camden County Grand Jury,* 10 N.J. 23, 89 A.2d 416 (1952).

If grand jury reports upon general public grievances are unauthorized, they must be even more improper if they censure particular individuals or accuse them of unindicted illegal acts.[7] Dession & Cohen, *supra,* at 707. As the Maryland Supreme Court stated,

At common law the function of the grand jury is confined to investigations of violations of the criminal law, and unless such investigations disclose facts which would constitute a recognized violation of the criminal law, they have no power or authority to criticize any particular individual or number of individuals. If the evidence obtained through their investigations warrants a presentment or indictment, under the law and the oath which they are required to take, they are bound to present or indict, and if in their judgment it falls short of showing the commission of a criminal offense, they are bound to refrain from making public the results of their investigation .... It has long been the custom and practice in this state for grand juries, in making their report to the court, upon asking for their discharge, to make statements as to general conditions within their jurisdiction. Such reports may have salutary effect and should be permitted so long as they do not point out individuals as subjects of public criticism and opprobrium.
*In re Report of Grand Jury,* 152 Md. 616, 623, 132 A. 370 (1927).

Such reports are contrary to the historical purposes for the grand jury, and its secrecy.

The Rhode Island Supreme Court has summarized five reasons for grand jury secrecy:

"(1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to

prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt." *State v. Carillo,* 112 R.I. 6, 11–12 n. 4, 307 A.2d 773, 776–77 n. 4 (1973) (quoting *United States v. Rose,* 215 F.2d 617, 628–29 (3d Cir.1954)).

The same considerations were repeatedly expressed in the colonial period. In 1680, Sir John Hawles gave a similar list of reasons for grand jury secrecy; prevention of the flight of the suspect, encouragement of fearless deliberations by the jurors, prevention of the *"Tampering"* or *"Sweeten[ing]"* of the evidence by the accused, and protection of the innocent against the harm to his reputation, as well as the hazard and expense, of accusation of crime and trial. Hawles, *supra,* at 6–7, 11–12 (emphasis in original). *See* J. Somers, The Security of Englishmen's Lives, or the Trust, Power, and Duty of the Grand Juries of England (Tewkesbury ed. 1798). Protection of the accused reputation ranks high among these:

A great injustice can be done and irreparable injury caused in the reputation of a citizen if it became known that there is or ever was before the grand jury any proceeding concerning such a person subsequently not indicted. You can readily see that in the event of such unfortunate disclosure a stigma would attach to the

---

7. Since neither the plaintiffs nor the defendants have appended a copy of the report to their pleadings, and since neither the complaint nor the answer states what the grand jury report actually said, the Court cannot, for the purposes of this decision, state whether the report alleged criminal or merely unprofessional behavior on

the part of the patrolmen. The Court will therefore address not only some of the implications of reports which censure particular public officials, but also those of reports which allege criminal actions but which either find insufficient evidence to indict or which decide not to indict for other reasons.

name of this individual which it would be difficult, if not impossible, to eradicate. *The Grand Jury—Its Role and Its Powers,* 17 F.R.D. 331, 333 (S.D.N.Y.) (grand jury charge by Judge Irving R. Kaufman).

The Rhode Island Rules of Criminal Procedure evidence this state's great regard for the reputations of individuals who are not indicted after grand jury investigations. Rule 6(e) provides that

a juror, attorney, interpreter, stenographer, operator of a recording device, or any typist who transcribes recorded testimony may disclose matters occurring before the grand jury only when so directed by the court preliminary to or in connection with a judicial proceeding or when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury.

Unlike its federal counterpart, Rhode Island Rule 6(e) additionally states that "[i]n the event an indictment is not returned any notes of a stenographer and transcriptions of such notes, and any other recordings of the proceedings, shall be delivered to and impounded by the court."

■ Since neither the common law nor modern Rhode Island law authorizes this sort of report, prosecutors are not required to aid in their preparation. Prosecutors are therefore not faced with a choice between dereliction of duty and possible civil liability should a grand jury wish to prepare a report. Extension of absolute immunity to include activities associated with these reports is unnecessary. A prosecutor would only face the spectre of retaliatory litigation if he were to choose to become involved in this unauthorized course of conduct. Moreover, since grand jury proceedings are nonadversarial and since a report without an indictment ends the proceedings involving a certain party, there are neither "checks that serve to restrain prosecutorial abuse," nor any "self-remedying mechanisms of the adversarial process" available to cure the abuse once it has happened.

*See Gray, supra,* 712 F.2d at 497–98. Defendants Roberts and McKenna Goldberg are therefore not entitled to absolute immunity for their alleged actions.

## II. QUALIFIED IMMUNITY

Although Roberts and McKenna Goldberg are not entitled to the absolute immunity defense of *Imbler v. Pachtman,* they may be entitled to the qualified immunity or, as some people refer to it, "good faith" defense of *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

■ Qualified immunity is an affirmative defense which must be pled in the answer. *Rhode Island Affiliate, American Civil Liberties Union v. Rhode Island Lottery Commission,* 553 F.Supp. 752, 770–71 n. 14 (D.R.I.1982). Although the defendants' memorandum of law does not discuss the *Harlow* immunity, Roberts and McKenna Goldberg did raise it in the "Third Defense" of their pleading. Since the defendants raised the qualified immunity defense in their answer and since it is related to absolute immunity, the Court will consider whether it bars the recovery of monetary damages from Roberts and McKenna Goldberg. *Cf. Harlow, supra,* 457 U.S. at 808, 102 S.Ct. at 2733 (encouraging the use of qualified immunity to terminate lawsuits).

■ In *Harlow,* the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct. at 2738. Applying this standard to the law in this case, the Court cannot find that the defendants' alleged actions of assisting the grand jury in preparing this report or of disseminating it involved clearly established rights of the plaintiffs. There is no decision or any other authority which discusses whether a Rhode Island grand jury has the power to issue a report such as this one. There are no reported decisions of this Court, the First Circuit Court of Appeals, or the United States Supreme Court which discuss whether a report of this sort violates rights secured by the federal Constitution. Final-

ly, this Court is aware of no decision by any court holding that a prosecutor violated an individual's constitutional rights through actions similar to those alleged here. The Court therefore finds that the rights at issue here were not "clearly established" within the meaning of *Harlow* and that defendants Roberts and McKenna Goldberg are entitled to the qualified immunity from monetary liability.

### III. OTHER RELIEF

 Besides damages, the plaintiffs have requested relief in the forms of expungement of the report, declaratory judgments that the preparation, issuance, and use of the report were unconstitutional, and an order enjoining the further use of the report by the Providence Police Department. The plaintiffs do not allege any continuing conduct by either Roberts or McKenna Goldberg. Therefore there is no live controversy between the parties over which a declaratory judgment or injunctive relief would be appropriate. Moreover, neither Roberts nor McKenna Goldberg has the power to expunge the report from court records.

Therefore, since neither legal nor equitable relief can be had against either defendant Roberts or defendant McKenna Goldberg, the Court hereby orders that the suit as to them be DISMISSED.